**HOLBROOK v. W. L. MOODY & CO. et al.**

No. 9533.

Court of Civil Appeals of Texas. Galveston.

Dec. 11, 1931.

Armstrong, Cranford, Barker & Bedford, of Galveston, for appellant.

Terry, Cavin & Mills, Williams, Neethe & Williams, Frank S. Anderson, McDonald & Wayman, and H. E. Kleinecke, Jr., all of Galveston, for appellees.

PLEASANTS, C. J.

We copy from appellant's brief the following sufficient statement of the nature and result of the suit, and substance of the pleadings:

"The appellant, T. J. Holbrook, trustee in bankruptcy of the bankrupt estates of Ed. McCarthy, Ed. McCarthy & Company, and David Fahey, brought this suit as plaintiff against W. L. Moody & Company, City National Bank, First National Bank of Galveston, United States National Bank of Galveston, Hutchings, Sealy & Company and South Texas National Bank of Galveston, all being banks located in Galveston, Texas; each individually and as composing Galveston Clearing House Association as defendants and appellees herein to recover the face value of a certain alleged negotiable instrument in the sum of $19,-139.45 with interest.

"The trustee in bankruptcy of the bankrupt estates of Ed. McCarthy & Company and David Fahey, plaintiffs, in the trial court in his first amended original petition averred that the defendants together with the Banking House of Ed. McCarthy & Company, and the Peoples Bank, a private banking house, of which W. B. Wallis was proprietor, were on the 29th day of September, A. D. 1926, and for many years prior thereto associated together in a voluntary association 'under the name of Galveston Clearing House Association, the business of which said Association was to effect daily settlements of the debts of members of said Association owing from the members of said Association by reason of the discharge by the various members of said Association of the banking obligations of each other in the due and regular course of banking business of the same members being carried on by them at that time in the City of Galveston; that on the 29th day of September, A. D. 1926, the Galveston Clearing House Association acting by its manager, R. E. Robinson, with the knowledge, consent and direction of the members of said Galveston Clearing House Association and according to an understanding, agreement and plan of operation existing between the members of said Association, executed and delivered to Ed. McCarthy & Company its draft in the sum of $19,139.45 on the Peoples Bank payable to the order of Ed. McCarthy & Company for the purpose of paying Ed. McCarthy & Company a balance of debits owing to the said Ed. McCarthy & Company on account of monies which the said Ed. McCarthy & Company had advanced for other members of the Clearing House Association in payment of obligations drawn against said other members of the Clearing House Association; that on the morning of the 30th day of September, A. D. 1926, and before a meeting of the Clearing House Association at one o'clock P. M. that day the Peoples Bank upon which said check was drawn had closed its

doors and had become notoriously insolvent; that on the 30th day of September, 1926, Ed. McCarthy & Company called upon the manager of the Clearing House Association for the settlement of said check, and on the following day at a meeting of said Clearing House Association demanded payment of said check from the Clearing House Association, which it refused and still refuses to pay; that said check had come into the possession of plaintiff as trustee in bankruptcy of the estate of Ed. McCarthy & Company, the holder thereof in due course, and praying for judgment against defendants jointly and severally for the amount of said draft with interest; that plaintiff further alleges in the alternative that according to an agreed plan of operation and arrangement, which plan so agreed upon and practiced was in effect on the 29th day of September, 1926, and had been for a long time prior thereto; the debits and credits between the individual members of said Association would be co-mingled in the accounts with the Clearing House Association, and the total debits owing by the debtor members would be treated as debts owing to the association, and the total debts of the creditor members would be treated as debts owing by the Association to such creditor members to be paid by the Association, and for the purpose of paying such debits the Association would draw its draft upon such of the debtor banks, and in such sums as the manager of the Association might choose and designate; that the draft aforesaid was given to Ed. McCarthy & Company by the Association acting by the manager of the Association for the purpose of discharging in part debits owing by the Association to the said Ed. McCarthy & Company as ascertained in the meeting of September 29, 1926, and praying that he is entitled in equity to a judgment requiring each of said defendants to contribute his pro rata share of such debt in accordance with such agreement and understanding; and plaintiff further alleges in the alternative that on the 29th day of September, 1926, at the meeting of said Clearing House Association, he brought in and presented in the meeting debits against the other members of said Association in the total sum of $40,808.91; that other members of said Association brought in and presented to the Clearing House Association for settlement and payments large amount of debits; that with the exception of the defendant, South Texas National Bank and Ed. McCarthy & Company each of said banks was paid in full for the debits which it brought in and presented to the Clearing House Association; that although Ed. McCarthy & Company surrendered to the members of the Association the debits which he held against the various members of the Association amounting to $40,808.91 as aforesaid, $19,139.45 of the said total amount of debits so surrendered by him remains unpaid; that South Texas National Bank received in part pay-

ment a draft similar to one sued upon herein by the plaintiff drawn by the Galveston Clearing House Association on the People's Bank in the sum of $4,383.15, making a total of $23,522.60 of debits surrendered by Ed. McCarthy & Company and the South Texas National Bank for which they have not received payment; and praying that each of the defendants make contribution for the purpose of satisfying and discharging the unpaid debits amounting to $23,522.30 in such proportion as the Court may determine to be just and proper and in consonance with the principles of equity. (Tr. pp. 19–26.)

"The appellees filed separate answers, each answering by way of general demurrer, and general denial, specially denying that the draft described in plaintiff's petition was executed by any one with their authority so as to make the same binding on these defendants; specially answering that the draft sued on by plaintiff was not presented to the payer on the day of its issuance, as alleged to be required by the Negotiable Instruments Act (Rev. St. 1925, arts. 5932–5948) and no notice of its dishonor or non-payment was given to these defendants as drawer or persons secondarily liable on this draft; and further specially answering that plaintiff is estopped to claim any liability upon these defendants by reason of this draft.

"This case was tried before the Court without a jury, and judgment rendered in favor of the defendants."

At the request of appellant, the trial court filed the following findings of fact and conclusions of law:

"1. I find that for many years prior to the 29th day of September, 1926, all of the banks located in the City of Galveston including the defendants herein as well as the bankrupt banking firm known as 'Ed McCarthy & Co.,' of whose estate the plaintiff is Trustee in bankruptcy, formed and composed what was known as the 'Galveston Clearing House Association.'

"2. That the Galveston Clearing House Association was not a partnership nor a corporation, that it had no written articles of association and no written by-laws, rules or regulations; that its sole and only purpose, custom or reason for existence was to enable the several banks to make daily exchange and settlement between themselves covering checks drawn on the several banks of the city and cashed through banks other than the drawee; that such an arrangement is a business necessity and is universally followed in cities throughout the country having several banks.

"3. That the custom of the Galveston Clearing House was as follows: That each business day, at 1 o'clock, each bank sent a representative to a designated meeting place, who carried with him all checks drawn on other

banks of the city and cashed or otherwise put through his said bank. Before going into the Clearing House meeting each bank separated the checks to be carried to the meeting, so that it could deliver to each other bank all checks drawn on it, together with the aggregate amount of said checks. Each bank had what was known as a Clearing House book. On the upper part of each sheet was printed the name of each bank in the City of Galveston except the bank whose book it was, and, after separating and tabulating the checks it held on each other bank, the amount of the several checks held against the other banks was listed opposite said bank's name in the first column to the right on said page, and the total of all checks carried into the Clearing House against all other banks was footed. The total of this column constituted the total credit carried by any individual bank against all other banks of the city into the Clearing House. The Clearing House had a manager who received a nominal salary paid jointly by all members of the Clearing House and whose duty it was to regulate in an orderly fashion the business of the meeting. At meetings the Manager would require each bank to state the total amount of checks it had that day in the Clearing House against each other bank, and as these amounts were called off by each respective bank the representative of each other bank would place the amount of the checks held against his bank by each other bank in the second column of said book opposite the proper bank. When this process was completed and the second column totaled it would represent the total gross debit in the Clearing House of each individual bank, or, in other words, it would represent the total amount of checks presented in the Clearing House by all other banks against it. The difference between these columns would establish whether any particular bank was a creditor or a debtor in that day's clearance. After the debits and credits of all banks were thus established the lower half of the sheet was then filled out by each representative showing which banks had credits in the Clearing House for any particular day and which banks had debits and the amounts of said debits and credits. These two columns, of course, must necessarily balance. It was then the duty and custom of the Manager of the Clearing House to draw forthwith at said meeting drafts on the debtor banks in favor of the creditor banks for the exact amount of their respective debits and credits. This draft was signed 'Galveston Clearing House Association, by ———, Manager.' This draft was then delivered to and accepted by the representatives of the respective creditor banks in settlement and satisfaction of their credit in the Clearing House and was recognized by the respective debtor banks as an obligation to pay the amount of said draft to the creditor bank to which it had been issued, and at said meeting, after the settlement was effected as above stated, the representative of each bank delivered to the representative of each other bank all checks brought by him into the Clearing House against said other bank, and, in turn, received from the representative of each other bank checks brought by them into the Clearing House against his bank. It was the custom, required by business necessity, for each bank to accept at the Clearing House meeting as good all checks drawn on his bank and tendered by each other bank and to accept the amount of said checks as stated by said other banks as being correct. It was the custom and unwritten rule that forthwith upon returning to his bank each representative would carefully examine and check the various checks delivered to him at the Clearing House by all other banks drawn against his bank, for the purpose of ascertaining whether there was any error in the claimed aggregate amount of said checks, as well as to determine whether said checks were forgeries, overdrafts, or otherwise incorrect and not good, and if any error was found or any bad or defective checks found, each bank would communicate with the respective bank from which they received said check in the Clearing House, before 4:30 of the same afternoon, and adjust the error or difference. It was universally understood and recognized that this 4:30 rule was a business necessity because of the fact that many of the checks had come through the bank carrying same into the Clearing House from out-of-town correspondents who expected and required an immediate remittance of the amount of said collection or an immediate report that the check was not good, and for other reasons not necessary to mention here. It was also well understood among the several banks of the city that unless a bank on whom a check was drawn would report to the other bank bringing said check into the Clearing House, by 4:30 of the same day, any vice existing in said check, it would be assumed and considered that no vice or error existed. I find that the same reasons requiring the 4:30 rule with reference to the checks of individuals would also require that Clearing House checks be likewise collected by 4:30 of the same day or be considered as accepted as good. I find this because the transactions had in the Clearing House on any particular day were so interlaced and interdependent that such transactions could not well or prudently be unraveled or rearranged after 4:30 of the day of settlement. This, principally, because, as above stated, all banks were accustomed to make remittances immediately after 4:30 on all out-of-town collections covering checks involved in that day's Clearing House settlement.

"4. I find that it was largely the custom of all banks not to present their Clearing House credit drafts to the debtor bank on which

same was drawn before 4:30 of the same day, or at any time at all except through the Clearing House on the following day, except in cases where the draft was for a substantial amount and the bank holding same needed the money represented by said draft. I further find, however, that any bank holding a Clearing House credit draft had a perfect right to present its draft to the bank on which same was drawn for any amount and at any time had it seen fit to do so. When the banks elected to present their credit draft through the Clearing House the next day, same was handled similarly to an individual check drawn against the other bank, and thus received proper credit and adjustment in the following day's clearance.

"5. I find that the contingency of possibility of a bank on whom a Clearing House draft was drawn failing or becoming insolvent before payment of said draft was never discussed or contemplated by the various members of the Clearing House, but all banks appeared to have considered every other bank perfectly good and solvent.

"6. I find that on the clearance of September 28, 1926, Ed. McCarthy & Co., was a creditor bank in the Clearing House meeting and that the Peoples Bank was a debtor; that in settling the account for September 28th, the Manager of the Clearing House delivered to Ed. McCarthy & Co., a draft on the Peoples Bank for some $23,000.00, which was accepted by Ed. McCarthy & Co.

"7. I find that for some time prior to the said 28th day of September, 1926, Ed. McCarthy & Co. maintained a safety deposit box with the company known as the 'Galveston Trust and Safe Deposit Co.,' which business was conducted within the office of the Peoples Bank and by the same employees as the Peoples Bank and that it was the daily custom of either Mr. Ed. McCarthy or his brother, Mr. Sam McCarthy, who was cashier of Ed. McCarthy & Co., bank, to visit the Peoples Bank for the purpose of going to said box.

"8. I find that on the morning of September 29, 1926, the said Sam L. McCarthy visited the Peoples Bank and had a conversation with Mr. Henry Schroeder, who was, in turn, cashier of the Peoples Bank and next in authority to Mr. W. B. Wallis, owner thereof; that for some 10 days prior, said W. B. Wallis was confined to his home with sickness and that in said conversation Sam. L. McCarthy asked Henry Schroeder concerning Mr. Wallis' condition and was told by Mr. Schroeder that 'Mr. Wallis was done for; that his mind was gone; that he (Schroeder) did not know what to do; that he had no money; and that if any checks came through the Clearing House against them that day he could not pay them; and that he did not know what to do other than to close his doors.' I find as a fact, as testified by S. L. McCarthy, that this conversation did take place.

"9. I further find that at the time of this conversation the Peoples Bank had on hand in its bank the sum of approximately $30,000.00 in cash and exchange and that said bank was at that time open and doing business and that had the said S. L. McCarthy demanded payment of it of the Clearing House draft for some $23,000.00 it then held and which it had accepted at the Clearing House on the previous day the said Peoples Bank could and would have paid said draft. I find that the said S. L. McCarthy did not demand or make any attempt to collect said draft.

"10. I find that at the Clearing House meeting held at 1 o'clock on the 29th day of September, 1926, Ed. McCarthy & Co., used the Clearing House draft drawn on the Peoples Bank which it had received at the previous day's clearance as a credit in said Clearing House; that again on the 29th Ed. McCarthy & Co. was a creditor bank and the Peoples Bank was a debtor bank and that Ed. McCarthy & Co., accepted from the Manager of the Clearing House the draft sued on in this suit for the sum of $19,139.45, and that in said day's settlement the South Texas National Bank was delivered and accepted a draft on the Peoples Bank for approximately $4,800.00.

"11. I find that at the clearance of September 29th, Ed. McCarthy & Co., alone of all the banks forming the Galveston Clearing House Association, knew or had any knowledge that might lead them to such conclusion that the Peoples Bank was insolvent or in an insecure condition; that no intimation was given by anyone connected with Ed. McCarthy & Co., at the Clearing House meeting on the 29th or to any representative of any bank in the Association that the Peoples Bank was insolvent or in an uncertain condition.

"12. I find that Ed. McCarthy & Co., accepted the draft sued on in this suit at about 1 o'clock on September 29, 1926, and made no attempt to collect same from the Peoples Bank, although the Peoples Bank was open for business and doing business until about 11 o'clock on September 30, 1926. I also find that at the hour of closing on September 30, 1926, the Peoples Bank had approximately the sum of $30,000.00 in cash and exchange with which the draft in question could have been paid and would have been paid had demand for such payment been made by Ed. McCarthy & Co.; that instead of attempting to cash the draft Ed. McCarthy & Co., held same until the Clearing House meeting of September 30th, when it again attempted to use said draft as a credit in the Clearing House by placing same among the checks it held against the U. S. National Bank.

"13. Assuming the draft or instrument involved in this suit to be a check within the purview of section 185 of article 5947 (Negotiable Instruments Act) of the Revised Stat-

utes of Texas (1925) and that the duty to present same for payment within a reasonable time after its issue, as required by section 186, of said article 5947, was imposed upon Ed. McCarthy & Co., I find that, having due regard to the nature of the instrument in question, the usage of the Galveston Clearing House Association with respect to such instruments, and the facts of this particular case, Ed. McCarthy & Co. failed to present said draft, instrument or check for payment to the said Peoples Bank within a reasonable time after its issue, as contemplated by section 186, of article 5947, and section 193 of article 5948 of the Negotiable Instruments Act. In other words, I find that, having regard to the nature of the instrument in question, the usages of the Galveston Clearing House Association with respect to such instruments, and the facts of this particular case, reasonable prudence should have induced and prompted Ed. McCarthy & Co., to have presented the draft, check or instrument in question for payment to the Peoples Bank as quickly as possible after its issuance and acceptance at 1 o'clock on September 29th and certainly before the bank closed its doors on the morning of September 30th, and that its failure to so present said instrument for payment was an unreasonable length of time. I find that had Ed. McCarthy & Co., presented said draft, instrument or check for payment to the Peoples Bank at any time after its issuance up to just prior to said bank's closing, said draft or check would have been paid. In this connection, I find that the banking establishment of Ed. McCarthy & Co., was located on the same street as the Peoples Bank and about one-half block therefrom.

"14. If I am mistaken in assuming that the instrument sued on comes within the purview of articles 5947, and 5948 of the Negotiable Instruments Act, then I find as a fact that under the usages and customs of the Galveston Clearing House Association and the particular facts of this case, as hereinabove stated, reasonably good business judgment and prudence, as well as good faith, required Ed. McCarthy & Co., immediately after the conversation had between S. L. McCarthy and Henry Schroeder as above referred to, to have presented for payment and demanded payment of the draft then held by Ed. McCarthy & Co., which, as above stated, would have been paid had said demand been made, and that the failure of Ed. McCarthy & Co., to present and demand payment of said draft, but, instead, carrying the same into the Clearing House at the next meeting thereof and using said draft as a credit and again accepting a draft on the Peoples Bank for a small amount, without divulging to the other members of the Clearing House Association, the valuable and important information it possessed, constituted such bad faith on the part of Ed. McCarthy & Co., as to preclude it or its legal representatives, the plaintiff herein, from asking any contribution from the other members of the Galveston Clearing House Association.

### "Conclusions of Law

"Accordingly I conclude that plaintiff take nothing by his said suit and that defendants each and all go hence without day and recover their costs."

Appellant's brief presents eighteen propositions germane to a number of assignments of error relied on as grounds for reversal of the judgment of the trial court. All of these propositions have been duly considered, but we deem it unnecessary to set out and discuss them in detail, and will content ourselves with a statement of our conclusions upon the questions presented which we regard material and controlling in the disposition of the appeal.

Appellant's whole case is based upon the contentions hereafter set out which are embodied in the propositions presented in the brief.

The first of these contentions is thus presented in appellant's third proposition: "The draft in suit having been drawn upon the Peoples Bank, a debtor to the Clearing House in the clearance of that day, and in favor of Ed. McCarthy & Co., a creditor of the Clearing House in the clearance of that day, and same having been executed and delivered to the payee bank in the name of the Galveston Clearing House Association by the Clearing House Manager under his implied authority, in accordance with the practice and custom of the Clearing House in settling with its debtor members and creditor members and with the knowledge and consent of all members of the Association, the trial court should have given a natural construction to the instrument and should have held as a matter of law that the Clearing House Association was in the legal position of a drawer of the draft, and subject to the liabilities of a drawer."

██ While the draft upon which appellant's suit is based is on its face an obligation of the Clearing House Association, when the undisputed facts are considered, there is no ground for the conclusion that as between the parties to the draft it can be regarded as an unconditional obligation of the clearing house to appellant having all of the attributes of a merchant's bill of exchange and subject to our statutory rules applying to negotiable instruments. There is an entire absence of any evidence of an express agreement of the members of the Clearing House Association that the manager of the association was authorized to issue said draft as an unconditional binding obligation to the member to whom it was made payable, and we do not think such authority can be implied from any evidence in the case. On the contrary, it seems clear to us from the undisputed evidence that as be-

tween the parties to the instrument the draft was only intended as a statement of accounts between the members, which for their own convenience was put in this form, and had been at all times during the existence of the association accepted as the obligation of the debtor member upon whom it was drawn as ascertained by the clearing house audit of accounts between its members made under the direction of its manager as set out in the fact findings of the trial judge. The clearing house was not indebted to McCarthy & Co., and to make this draft under the facts of this case an obligation of the clearing house would be to place form above substance, which equity never permits unless necessary to protect the rights of an innocent purchaser of the instrument.

The cases, Yardley v. Philler, 167 U. S. 344, 17 S. Ct. 835, 42 L. Ed. 192; Mt. Morris Bank v. Ward Bank, 172 N. Y. 244, 64 N. E. 810; and Dorchester v. Bank, 106 Tex. 201, 163 S. W. 5, 50 L. R. A. (N. S.) 542, cited by appellant in support of its proposition, arose upon a different state of facts from those present in this case.

The first of these cases involved the liability of the members of the Philadelphia Clearing House upon a certificate issued by it, in accordance with the usages and customs of the clearing house which are thus stated in the opinion: "In addition to the function of affording a means for the daily clearing of balances, the Clearing-House Association, by agreement among its members, issued, at periods when it was deemed best to do so, clearing-house certificates. These certificates were delivered, under the discretion of the managers, when applied for by a member of the association, and were secured by the pledge of bills receivable or assets taken from the portfolio of the bank obtaining the certificates. These certificates were available as cash in settlements between the banks, and for other purposes; and the object of issuing them was, in times of panic or stringency, to create, to the extent of the certificates, solidarity of responsibility between the banks, as each bank was liable for a proportionate share of the certificates in case of default in their payment, thus fortifying the credit of one by the credit of all."

Upon the facts set out in the opinion cited the Supreme Court held that the certificates so issued by the Philadelphia Clearing House Association "were the joint obligations of all of the member banks."

The second case is cited as showing that under the method used by the New York clearing house it was in fact, not only an auditing, but a collecting agency for all of its member banks. In so far as its auditing method is concerned, it was entirely similar to that of the Galveston clearing house, but the opinion in the case shows that it did not issue checks against the debtor banks, but such banks were required to pay to the clearing house the amounts of their respective indebtedness as shown by the clearing house audit of the accounts.

This case presents a wholly different question from the one decided by our Supreme Court in Dorchester v. Bank, 106 Tex. 201, 163 S. W. 5, 8, 50 L. R. A. (N. S.) 542, in that the draft or check involved in that case was in fact just what it purported to be, a check drawn by a debtor in favor of his creditor upon one bank in the city of Houston, and delivered by the creditor to the Merchants National Bank of Houston for collection. Before the check was presented for payment, the drawee bank failed, and the only question presented to and decided by the Supreme Court was whether the Merchants' Bank in following the custom then prevailing with all the Houston banks of collecting checks through the clearing house had used sufficient diligence to relieve it of any liability for failing to collect the check before the failing bank closed its doors. In deciding this question, the court held:

"It being the duty of the receiving bank, defendant in error, to its depositor, Dorchester, to present the draft during banking hours of the next day, the 17th of October, it, the receiving bank, could not bind the depositor, Dorchester, by conforming to the rules of the Clearing House, which were at variance with the laws. 'The rights of a nonmember depositor in a member bank are not affected by the clearing rules, nor can he take advantage of them.' 1 Morse on Banks and Banking, § 351; Bank v. Bank, 139 Mass. 513, 2 N. E. 89; Overman v. Hoboken City Bank, 31 N. J. Law (2 Vroom.) 563. The opinion in the last case cited discusses the relation of a depositor to a Clearing House of which it is not a member with convincing clearness. The facts were very similar to the present case. It was distinctly held that a nonmember of a Clearing House was not bound by its rules, and a member bank which adopted the methods of the Clearing House did not bind its depositor.

"The drawer of a bill of exchange has the legal right to have it presented for payment to the drawee within the time prescribed by law, and the payee is charged with the diligent performance of that duty. The agent of the payee has no more liberty in the collection than the principal; either must present the draft within the business hours of the second day, when, as in this case, the payee and drawee reside in the same city. The fact that parties to the instrument are members of a clearing house association cannot vary the rules of legal diligence in discharge of duties to a nonmember."

In further support of his contention under the proposition before set out, appellant cites the case of Ellis v. Jones, 144 Ga. 120,

86 S. E. 317, 318. All that this case decides is thus stated in the opinion in the case: "A clearing house is a voluntary association of banks for facilitating the mutual interchange of business, by affording a convenient method of obtaining daily settlements of balances between the banks forming the association, and also for the purpose of acting as a collecting agency for the component banks. 3 Michie on Banking, § 318. As a voluntary association they cannot appear as a party to an action; but where one who deals with such voluntary association, receiving from it checks, which are collected, and undertakes to remit to the association, by check payable to it, the net amount of the collection, the component banks of the association may jointly maintain an action on such check if dishonored."

From this statement of the facts and the issues involved in the cited cases it is manifest that none of them supports appellant's proposition.

■■ Appellant's next contention which is presented under appropriate propositions is that the evidence shows sufficient diligence on the part of McCarthy & Co. in the presentation of the check for payment to hold the drawer liable thereon. The check was not presented for payment in the time and at the place required by our Negotiable Instruments Statute, but appellant contends that the presentation for payment, having been in accordance with the custom prevailing between all the members of the clearing house, was sufficient to fix liability upon the clearing house, the drawer of the check. If we are wrong in our conclusion that the check was not the obligation of the clearing house, we cannot agree with appellant that McCarthy & Co. used sufficient diligence and good faith in its presentation to hold the members of the clearing house liable thereon.

The fact findings of the trial court before set out in full show: That on the day before the check on which the suit is brought was issued, a check for $23,000 in favor of McCarthy & Co., drawn on the People's Bank, was issued and delivered by the manager of the clearing house to McCarthy & Co.; that on the morning of the next day, before the meeting of the clearing house, at which the $19,000 check on which this suit is brought was issued, McCarthy & Co., through its cashier, Mr. Sam McCarthy, had notice of facts sufficient to put a reasonably prudent person upon notice that the People's Bank was in an insolvent condition, and that the check for $23,000 then held by McCarthy & Co. could not be paid, if presented. These facts were withheld by McCarthy & Co. from the other members of the association, none of whom had any knowledge thereof, and the check for $23,000 was presented to the clearing house, and McCarthy & Co. received credit therefor on September 29, the day on which the $19,000 check was issued. This check, notwithstanding the knowledge imparted to McCarthy & Co., was never presented to the People's Bank for payment. The trial court further finds upon sufficient evidence that, if the $19,000 check had been presented on September 29, it would have been paid by the People's Bank. Upon these facts, we cannot hold that the trial court erred in holding that the check was not presented for payment within a reasonable time under the provisions of our negotiable instrument statute, which provides that, "in determining what is a reasonable time, regard is to be had to the nature of the instrument, the usage of trade or business with respect to such instrument, and the facts of the particular case," and in further holding in effect that, because of the bad faith of McCarthy & Co. in withholding from its associates in the clearing house the facts obtained by it in regard to the insolvent condition of the People's Bank, it is estopped from asserting its claim against the other members of the clearing house.

These conclusions require an affirmance of the judgment, and it has been so ordered.

Affirmed.