187 So. 177

### WOODLAWN FEDERAL SAVINGS & LOAN ASS'N v. WILLIAMS, Superintendent of Banks.

#### 6 Div. 368.

Supreme Court of Alabama.

Jan. 19, 1939.

Rehearing Granted Feb. 21, 1939.

Further Rehearing Denied March 23, 1939.

Wm. S. Pritchard and David R. Solomon, both of Birmingham, for appellant.

Frank A. Wilkinson and Wilkinson & Wilkinson, all of Birmingham, for appellee.

Bradley, Baldwin, All & White and Irvine C. Porter, all of Birmingham, amici curiae.

FOSTER, Justice.

This litigation is in equity, and relates to the rights of the parties in respect to certain shares of stock in a building and loan association incorporated under the laws of Alabama, and later reincorporated or converted into a federal savings and loan association under Act of Congress and the statutes of Alabama. Act of July 8, 1935, page 222.

Under section 7109, Code, shares of stock were required to have a definite withdrawal value prescribed in the by-laws.

After its conversion, the charter provided for a repurchase at the instance of stockholders as follows: "Shareholders shall have the right to file with the association their written application to repurchase their shares in part or in full, at any time and upon the filing of such written application, to repurchase, the association shall number and file the same in order received and shall, after thirty days after the receipt of such application to repurchase either pay the holder the value thereof, in part or in full as requested, or apply at least one-third of the receipts of the association from its shareholders and borrowers to the purchase of such shares in numerical order."

On January 1, 1927, one Richards became a stockholder, and his rights as such became vested in the converted enterprise without special action for that purpose. He purchased one hundred shares of the aggregate value of $5,000. The agreed facts state that Richards "endorsed and delivered over to said association as payment for said shares of stock certain notes specifically described as follows: "it then describes the notes aggregating $6,001.44, less discount of $1,001.44, leaving a balance of $5,000. They include notes of Richards personally of $750.72. But they have all been paid. Payments have been made on the others, leaving a balance unpaid of $3,559.68. The association issued to him a certificate of stock, on the back of the stub there is a notation showing "balance due on notes principal amount" on the first of January of each year, up to January 1, 1937, when it was said sum of $3,559.68.

In 1929, Richards became indebted to the bank and we infer from the agreed facts assigned the stock to the bank as collateral security. See Richards v. Montgomery, 230 Ala. 307, 160 So. 706.

In 1926, the association had sold and issued its certificates for seventy shares all paid for in full, for $3,500. They were likewise assigned to the bank as collateral security. We will call that the Hershey stock.

On July 6, 1929, the bank went into liquidation under state laws, and the assets taken over by the superintendent of banks of Alabama, and a liquidating agent. On October 24, 1932, the superintendent of banks foreclosed and sold both issues of said stock and became the purchaser, and on November 8, 1932, a new certificate was issued for the seventy shares representing the Hershey stock, but no new certificate was issued for the Richards stock.

It was after this that the association was converted into a federal corporation. The superintendent of banks has given notice of his election to have all of the stock so held repurchased by the association in accordance with the charter power which we have quoted. This suit is in equity by the superintendent of banks to force the association to comply with such charter duty.

The association contests this right on the ground that it has a lien under section 7000, Code, for the debt due it by Richards, either as a part of the purchase price or on his indorsement of the notes assigned to it as a payment of the price.

And in the alternative, both as to the Richards stock and also as to the Hershey stock, that under section 7000, Code, the superintendent of banks was a stock holder of the association first by pledge to it of the stock and then by the foreclosure of that pledge by the superintendent of banks (see Ensley Mortgage Co. v. Chadwick, 223 Ala. 468, 136 So. 821, 80 A.L.R. 1334), and further in the alternative, that the association has a right to set off against its

liability to the bank by virtue of its charter duty to repurchase the stock, the amount of the balance unpaid of its deposit with said bank existing since prior to the time when the bank went into liquidation.

In that connection the facts are that when it did go into liquidation the association was a depositor and had a balance in that account of $12,840.25. On account of it, dividends have been paid the association pending liquidation aggregating $2,054.36, leaving still unpaid an amount in excess of its obligation to the bank on repurchase of the stock.

The cause was submitted for final decree on the agreed facts. The court held that the association had no lien on the Richards stock for the unpaid purchase price, because the agreed facts show that it accepted notes in payment and had no claim by virtue of the indorsement of those notes by Richards, because it was inferred from the circumstances that he did not intend to bind himself by his indorsement; and that the bank was not the owner of stock in the association when the bank went into liquidation, and that the association had no lien on any of the stock under section 7000, Code. The court did not allow any claim of right to set off.

We proceed now to consider the claim of a lien by the association on the Richards stock under section 7000, Code. As we have said, that is predicated upon three aspects. One is that the notes assigned to the corporation did not pay the obligation of Richards; the second is that, if so, his indorsement is sufficient to create such a debt under section 7000, Code; and, third, that the bank was a stockholder and owed the amount of the deposit.

■ The first point is expressly covered by the agreed facts. It states specifically that the notes were given in payment of the debt. The second theory is based upon the indorsements.

■ The description of the notes so indorsed is that they are such as to be negotiable. Section 9029, Code. The indorsement creates a contract in writing whose obligations are defined by statute, section 9090, Code, and not subject to be varied by parol evidence nor extraneous circumstances. Pointer v. Farmers' Fertilizer Co., 230 Ala. 87, 160 So. 252; Dean v. Lyde, 223 Ala. 394, 136 So. 857; 9 Alabama Digest, Evidence, ☞403, 423(6).

■ But the indorsement is a conditional obligation. Any suit which undertakes to enforce it must show a compliance with those conditions. O'Neal v. Clark, 229 Ala. 127, 155 So. 562, 94 A.L.R. 589; O'Neal v. Mason, 229 Ala. 142, 155 So. 567; Falkner v. Protective Life Ins. Co., 228 Ala. 57, 152 So. 34; Section 9114, Code.

■ The lien created by section 7000, Code, is to secure the collection of a debt presently payable. There is no such debt created by an indorsement unless the condition precedent to such liability has occurred. Notice of dishonor is one such condition, and knowledge otherwise acquired is not sufficient. O'Neal v. Clark, supra. The nearest approach to a compliance with this requirement is a statement in the agreed facts that the association had no notice of the claim of the bank until 1930, when its secretary, "being unable to collect the notes heretofore referred to, called on W. M. Richards for payment." That was intended merely to fix a collateral date. The cross-bill makes no allegation of notice of dishonor and no relief is sought in it on that account. It was properly denied.

■ As to the third contention, we agree with the trial court that when the bank went into liquidation it was not a stockholder of the association, but only a pledgee of stock. The subsequent foreclosure of the pledge does not relate back to the date of liquidation so as to change the status of the bank as a pledgee, and not owner of the stock at that time.

The only other question argued is whether the association may set off against its obligation to the bank under its repurchase clause the amount the bank owes it as depositor. We will treat this obligation as one to pay money by virtue of its charter.

The association was organized under Article 17 of Chapter 274, Code, as amended by the Act of August 26, 1927, page 431. Under its provisions the corporation had the right to make and alter all needed by-laws, rules and regulations and the right to amend its charter existing under section 238, Constitution. Under the Act of 1927 (page 432), it is provided that repayment to the shareholder shall be made when accumulated to full par value. And section 7109, Code, provides as follows: "All shares of stock in said association, upon which all dues and charges for one year or more have been paid, shall have a definite withdrawal val-

ue, which shall be set out in the by-laws of said association or in a duly adopted resolution of the stockholders."

The charter provision under the federal act, which we have heretofore quoted, is but the exercise of a contingent right which has existed since the corporation was organized and became a part of the contract with the stockholder, with the same effect on this transaction as though it had existed when the stock was first purchased.

We pause here to observe, in response to a suggestion in argument, that the Uniform Stock Transfer Act of July 22, 1931, page 565, has no bearing on the right of set off. If the right of set off exists, it is by virtue of the relations between the association and the bank, and not by virtue of a status existing before the assignment of the stock was made to the bank. Its claim as a holder in due course if available under the act otherwise is not therefore available here. Industrial Sav. Bank v. Greenwald, 229 Ala. 529, 158 So. 734.

The question is therefore directly presented of whether the association may set off its deposit in the bank which was in existence when liquidation began against its liability to the bank to repurchase the stock which is owned by the bank.

Section 10172, Code, makes mutual demands subject to set off unless there is something in the status of insolvency and liquidation of the affairs of the bank which prevent an application of the statute.

The subject has been involved in several of our cases, and the right to set off was recognized. Green v. McCord, 204 Ala. 364, 85 So. 752; Pickens County v. Williams, 229 Ala. 250, 156 So. 548; see First National Bank v. Dupuy-Burke Realty Co., 229 Ala. 696, 159 So. 231; Oates v. Smith, 176 Ala. 39, 57 So. 438, 440. We quote as follows from the Oates case, supra: "It is universally conceded that the changed status wrought by insolvency, or by the appointment of the receiver, does not impair then existing rights of set-off in favor of debtors. See note to St. Paul Trust Co. v. Leck (Minn.) 47 Am.St.Rep. 585; Scott v. Armstrong, 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059; 34 Cyc. 194."

There seems to be a unanimity of authority elsewhere to the same effect. Many of the cases have their basis upon

Scott v. Armstrong, 146 U.S. 499, 13 S. Ct. 148, 151, 36 L.Ed. 1059.

The National Banking Act, 12 U.S.C.A. § 21 et seq., requires the assets of a bank in liquidation to be distributed ratably among the creditors. It was contended that a preference would be created to allow such a set off. In answer to that the court in the Scott case, supra, observed:

"And it is insisted that the assets of the bank existing at the time of the act of insolvency include all its property, without regard to any existing liens thereon or set-offs thereto.

"We do not regard this position as tenable. Undoubtedly any disposition by a national bank, being insolvent or in contemplation of insolvency, of its choses in action, securities, or other assets, made to prevent their application to the payment of its circulating notes, or to prefer one creditor to another, is forbidden; but liens, equities or rights arising by express agreement, or implied from the nature of the dealings between the parties, or by operation of law, prior to insolvency and not in contemplation thereof, are not invalidated. The provisions of the act are not directed against all liens, securities, pledges, or equities, whereby one creditor may obtain a greater payment than another, but against those given or arising after or in contemplation of insolvency. Where a set-off is otherwise valid, it is not perceived how its allowance can be considered a preference, and it is clear that it is only the balance, if any, after the set-off is deducted, which can justly be held to form part of the assets of the insolvent. The requirement as to ratable dividends is to make them from what belongs to the bank, and that which at the time of the insolvency belongs of right to the debtor does not belong to the bank."

This has also been emphasized in the recent case of Willing v. Binenstock, 302 U.S. 272, 58 S.Ct. 175, 82 L.Ed. 248. The textwriters have fallen in line and cite it and many other supporting cases. 3 Michie on Banks and Banking 334; 9 Corpus Juris 867, 868-9 to 871; 7 Corpus Juris 746, section 537; 7 Am.Jur. 339, section 473, 529, section 735; 97 A.L.R. 588, Prudential Realty Co. v. Allen, Com'r of Int. Rev., 241 Mass. 277, 135 N.E. 221, 25 A.L.R. 938, 954.

The fact that the indebtedness to the bank was not mature at the time of in-

solvency should not interfere with the depositors' right to a set off. That was the status in Scott v. Armstrong, supra, and authorities are cited in 25 A.L.R. 946, and asserted in 7 Am.Jur. 342, section 475. Some authorities to the contrary are noted in 25 A.L.R. 947.

The general rule undoubtedly is that the right to set off a deposit against a debt due a bank which has become insolvent is fixed at the time the bank closes its doors. 7 Am.Jur. 341, section 474.

At that time and by that circumstance the deposit became due. And at that time the bank in the instant case held a contract of the depositor conditionally obligating itself to pay the bank money upon its election to receive it and notice of such election. The contract fixing that status was inchoately in existence the moment of insolvency, though the election had not been made so as to fasten on the depositor the duty presently to pay money. But the right to an election under such circumstance should be treated as encumbered with a corresponding right on the part of the depositor to off set his own duty then outstanding with the duty of the bank to pay him his deposit. We think there were then mutual subsisting demands within the spirit, perhaps the letter, of section 10172, Code, though the time of their effect is here fixed at the beginning of liquidation and by the statute it is at the commencement of the suit.

If the bank had given notice of its election before it closed its doors or exercised similar charter powers then existing, both claims would have been current at the commencement of the liquidation to the extent the law and by-laws then created such obligation. In equity the justice of the situation should prevail. Hall v. Clark, 227 Ala. 571, 151 So. 445; Fischer v. Pope, 233 Ala. 301, 171 So. 752.

The importance and justice of fixing that as the date when the right to set off must exist is not to protect the bank and its liquidating agent in respect to a claim held by the bank which is then a contingent liability, but not mature because the right to do so had not been exercised. We think that the principle is such that if either acquires a claim against the other after liquidation begins, not by virtue of a prior subsisting contract, it is acquired with its status as to the right of set off which existed before the assignment. Such assignment cannot have the effect of improving in that respect the rights which then applied. This is discussed in Oates v. Smith, supra, as follows:

"But it is held with equal unanimity that such debtors are not entitled to have set off against their debts claims which they have acquired subsequent to such insolvency, of which they have notice, or subsequent to the appointment of the receiver. * * * The reason in each case is elementary: (1) The receiver succeeds to the assets as they are, and subject to every specific right and equity which existed against the insolvent; and, where a set-off exists, the debtor equitably owes only the balance over and above the amount of his counterclaim, and this is the debt that passes to the receiver; and (2) the impartial distribution of the assets, which constitute a trust fund in equity, without any preference of one creditor at the expense of others, would be palpably defeated. After insolvency is established, a creditor's claim, so far as the assets are concerned, gives him no more than the right to file his claim seasonably and to share ratably in their distribution. And when he assigns his claim to another, after such insolvency is established, the assignee acquires no other nor higher right than had his assignor."

But it should not prejudice the standing of a claim which the bank held when its doors were closed, that it was subject to the election of the bank. The election merely served to mature a contingent liability then existing as subsequently amended. In its quality as contingent there was then an inchoate right of set off, which matured with the maturity of the claim.

In this case, the agreed facts show that the deposit of the association is more than its liability to the bank on account of its obligation to repurchase from it the stock in question. The result is that the superintendent of banks is not entitled to the relief which the trial court granted. That decree is therefore reversed, and one is here rendered to the effect that the balance of the deposit account of the association, which now remains unpaid, of $10,785.89, is reduced by the sum of $8,500, and on the balance of which only shall the association have further ratable distribution, to-wit, $2,285.89.

It was however necessary for the superintendent of banks to file this suit to establish its right to have the amount of the deposit thus reduced. This right was

denied in the answer and cross-bill, but admitted in the agreed facts. Considering that status, we think that all the costs which accrued in both courts should be equally divided between the parties, so that its payment to that extent by the superintendent of banks is a proper credit in his accounts.

Reversed and rendered.

GARDNER, THOMAS, and BOULDIN, JJ., concur.

### On Rehearing.

The majority, namely, ANDERSON, C. J., GARDNER, THOMAS, BOULDIN, and BROWN, JJ., disapprove the holding of the foregoing opinion touching the question of set-off therein treated, and adopt the opinions of Justices BOULDIN and THOMAS as the opinion of the Court.

The application for rehearing is therefore granted: the judgment of reversal is set aside and the cause affirmed.

FOSTER and KNIGHT, JJ., dissent.

BOULDIN, Justice.

Upon reconsideration I am firmly of opinion we have misapplied the doctrine of set-off in favor of a depositor of an insolvent bank in liquidation, and by so doing given preference over others with like equities in the distribution of trust funds.

The pertinent facts, briefly stated, are these:

Woodlawn Savings Bank failed and went into liquidation July 6, 1929. Among the assets coming into the hands of the liquidating agents were notes of one Richards evidencing his indebtedness to the bank. These notes were not then due. This indebtedness was secured by building and loan stock owned by Richards and pledged as collateral.

Failing to collect this indebtedness from the debtor, the liquidating agent, in 1932, foreclosed its lien on this collateral, becoming the purchaser and owner of the stock as part of the trust estate.

Certain litigation arose between the liquidating agent and a third party touching the ownership of this stock, resulting in a decision in favor of the trust estate. Richards v. Montgomery, Sup't of Banks, 230 Ala. 307, 160 So. 706.

After this decision, the liquidating agent undertook to assert the withdrawal rights, or repurchase provisions in favor of the owner of such stock. This was denied upon the ground, among others, that the Building and Loan Association was a depositor in the failing bank at the time it went into liquidation, and claimed the right to set-off the withdrawal value of this stock against its deposit, still unpaid.

This bill was then filed to enforce the collection of this withdrawal value of the stock as part of the trust estate to be shared by creditors of the failed bank.

The question is: Has the Building and Loan Association a right to set-off its deposit in the bank against this demand?

Such principles are well settled and not questioned. Among these, a debtor to a bank at the time it fails may set-off his deposit in the bank against his indebtedness, whether such indebtedness be past due or not at the time of the failure of the bank.

In other words, if his indebtedness to the bank exceeds his deposit, he is entitled to have his deposit credited on his debt. Only the balance of the debt becomes assets held in trust by the liquidating agent, and his deposit is satisfied so that he does not share in the trust estate. If the deposit exceeds his indebtedness, the indebtedness is satisfied and he becomes creditor only as to the residue of his deposit. The indebtedness, in such event, does not become assets available as part of the trust estate.

Another equally well settled principle is this:

When a bank fails, closes its doors, and is put into liquidation, its assets become a trust fund for the benefit of its creditors. Its assets are determinable as of that date, and the equities of all beneficiaries of the trust are fixed as of that date. No subsequent act of the liquidating agent in course of his duties as trustee can give one creditor a preference over others of like class.

Applying this principle to the case in hand, we observe that outstanding loans, bills receivable, owned by the bank at the date of insolvency are assets of the bank, passing to the liquidating agent as part of the trust funds, to be shared alike by all depositors.

These Richards notes were, therefore, assets of the Bank. They passed into the trust fund. The stock pledged as collateral passed with them but only as security for this indebtedness. Neither the Bank nor the liquidating agent was the owner of this

stock at that time. Indeed, the Richards notes not having matured, the right to foreclose and obtain ownership had not then arisen. But the vital· point is that the Bank's relation to this stock before failure and that of the liquidating agent thereafter was one of trust. The pledgor had rights in this collateral. He had the right to pay his debt and reclaim his collateral. The Bank had no right to dispose of it, or any proceeds therefrom, other than in the payment of the debt for which it was collateral. If, on foreclosure, this stock had been purchased by a third person, the proceeds certainly would have become trust funds, representing payment on the indebtedness for which the stock was pledged as collateral. Certainly, if the pledgor had paid his debt and redeemed his stock, or if a third party had bought at foreclosure sale no right of set-off here asserted could have arisen.

 But, in the bona fide effort to realize the most on the assets, a duty demanded of a trustee acting for beneficiaries of such funds, the liquidating agent bought in the stock. Bought it in not for the Bank as a going concern, but bought it in as a means of collecting assets beneficially owned by all depositors alike. It was this act of taking over the stock as a means of collecting assets constituting part of the trust funds, which placed title in the liquidating agent and carried the right to demand the withdrawal value as an incident to ownership. To the writer it seems obvious that this stock represents the proceeds of the notes to which it was collateral; that like the notes it is part of the assets held in trust for all depositors alike. To allow this off-set is clearly and simply to give preference to one depositor over all others as regards assets which at the time of insolvency became the property of all alike. It is not a question of inchoate rights ripening into perfected rights; nor of equity treating that as done which ought to have been done. But in my opinion, it is an effort to alter a status after equities of others have intervened, thus defeating such equities, and working a preference among those of equal equities. Equality is equity.

The question is of importance not only as between these parties, but involves the whole question of proper liquidation of the affairs of insolvent banks.

Without elaborating we may say the whole question of assets, part of the trust fund, and of liabilities, claims of creditors, to share therein would turn on the character of collateral security held by the bank when insolvency intervenes.

If the doctrine asserted by appellant prevails the quantum of assets constituting the trust fund and the quantum of liabilities payable pro tanto therefrom would vary from time to time dependant on the manner in which collateral was made available under contractual obligations obtaining when the Bank closed.

It results that the application for rehearing is granted: the judgment of reversal is set aside and the cause affirmed.

ANDERSON, C. J., and GARDNER, THOMAS, and BROWN, JJ., concur.

FOSTER and KNIGHT, JJ., dissent, as expressed in the extended opinion by FOSTER, J.

THOMAS, Justice.

This opinion is an amplification of Justice BOULDIN'S opinion. The facts may be stated as follows:

(1) The Woodlawn Savings Bank ceased business and its affairs were turned over to the Superintendent of Banks to be liquidated on July 6th, 1929. Since that time the said bank has been in the process of liquidation by the Superintendent of Banks.

(2) That at such time the Woodlawn Building & Loan Association had a general, dividend, expense and a trustee account, aggregating $12,401.25.

(3) That during liquidation the Superintendent of Banks paid a series of dividends to the depositors in said bank, and paid the Woodlawn Building and Loan Association its pro rata of the dividend so disbursed in the aggregate amount of $2054.36 to the four general accounts.

(4) That prior to the date of July 6, 1929, the Bank loaned Roy G. Hershey the sum of $3,070, evidenced by note due June 24, 1929, to which was pledged as collateral security seventy shares of the capital stock of the Woodlawn Building and Loan Association.

(5) That prior to July 6, 1929, the bank loaned to one William Richards various sums in the amount of five thousand dollars, taking his promissory notes therefor, and as collateral security a pledge of one hundred shares of the capital stock of the Woodlawn Building & Loan Association, evidenced by a stock certificate (No. 95) dated January 1st, 1927. These notes were not due when the estate went into the

hands of the Superintendent of Banks for liquidation.

The foregoing collateral, securing said notes as reissued on and after July 24, 1936, under the action of the Board of Directors in conformity with the Act of Congress, carried a future withdrawal right when the contract matured, and when redemption was duly demanded of that association by the owner of such legal title thereto.

(6) It is averred in the 8th paragraph of the bill as follows: "When the assets of the Woodlawn Bank were turned over to the Superintendent of Banks, on, towit, July 6th, 1929, the Hershey notes, the Richards Notes, together with the collateral as aforesaid, came into the possession of the Superintendent of Banks as an asset of the Woodlawn Savings Bank, and, being then due, the Superintendent of Banks made continuous effort to get the makers of said notes to pay the said several debts then due the bank, being unable to do so, the Superintendent of Banks did, on, towit, the 24th day of October, 1932, foreclose, sell and buy in said collateral after giving notice of the intention so to do by advertising said sale in a newspaper, under the provision of Section 6746 of the Code of Alabama 1923."

(7) That after the foreclosure of the Richards and Hershey notes, the Superintendent of Banks tendered to the Woodlawn Building and Loan Association the Hershey certificate for reissue in the name of Woodlawn Savings Bank in Liquidation. On the 8th day of November, 1932, the building and loan association issued to the Woodlawn Savings Bank certificate No. 286 for 70 shares of capital stock of the building and loan association, and no restriction of the transfer of the said shares is stated in or upon the certificates in any manner.

(8) After such foreclosure, Mrs. L. M. Richards, mother of William Richards, filed her suit against the Superintendent of Banks, claiming the William Richards stock (100 shares of building and loan association stock). The Superintendent of Banks successfully defended this suit, the judgment being affirmed by the Supreme Court in Richards v. Montgomery, Sup't of Banks, 230 Ala. 307, 160 So. 706.

(9) That on June 3rd, 1936, the stockholders of the building and loan association approved a plan of conversion which had been approved by the Federal Home Loan Bank and the Board of Directors of the Woodlawn Building & Loan Association, providing for the conversion of the building and loan association into a Federal Savings & Loan Association, which plan was completed on July 24th, 1936.

(10) It is further averred that J. H. Williams, as Commissioner of the Building and Loan Department of the State of Alabama, duly issued his certificate of conversion; that under the plan of conversion, the Federal Savings & Loan Association agreed to, as a part of the plan, reissue shares of stock in the Woodlawn Federal Savings & Loan Association for the stock in the Woodlawn Building & Loan Association.

(11) That on January 18th, 1937, the Liquidating Agent for the Woodlawn Savings Bank filed a written application for the repurchase of shares of stock held by the Woodlawn Savings Bank in liquidation, in the name of the Superintendent of Banks with the Woodlawn Federal Savings & Loan Association.

(12) That on January 19th, 1937, the Woodlawn Federal Savings & Loan Association (received by the Superintendent of Banks on January 22, 1937) notified and informed the Superintendent of Banks that the Woodlawn Bank was indebted to the Woodlawn Building & Loan Association, and demanded that said indebtedness be paid in full and further notified the Superintendent of Banks that unless the demand for payment was complied with, the Woodlawn Federal Building & Loan Association would sell at public auction the stock in the Woodlawn Building & Loan Association held by the Superintendent of Banks, towit, the stock represented by Certificate No. 95 for one hundred shares in the name of William Richards, and Certificate No. 286 for seventy shares issued as aforesaid.

(13) It is further averred that Woodlawn Savings Bank cannot and will never be able to pay the depositors of said bank in full, and that the Woodlawn Federal Building & Loan Association will, unless restrained, sell said stock, thereby depriving the Woodlawn Savings Bank and the depositors of said Bank of the sum of $8,500.

(14) The Woodlawn Federal Building & Loan Association will not repurchase said stock unless required to do so by this court.

The foregoing facts may be analyzed and stated as follows: That prior to insolvency Hershey and Richards became indebted to the Woodlawn Savings Bank, and hypothecated stock of the Woodlawn Building and Loan Association as collateral security for their respective notes.

The bank came into the hands of the superintendent of banks before the maturity of the Richards and Hershey obligations. At that time the Building and Loan Association had on deposit $12,401.25.

Richards and Hershey defaulted on the said notes after the bank's assets and estate were taken over and the pledge of collateral stock was foreclosed and the assets of the bank were increased by this Building and Loan Association stock so brought into the assets of the bank by the foreclosure. Said assets went into the corpus of the whole trust estate, and of necessity had to be distributed ratably among all creditors.

It should be noted further that a number of dividends were paid on the $12,401.-25 indebtedness to the Building and Loan Association before the bill was filed eight years later, or on February 6, 1937. These dividends, according to the averments of the bill, amounted to $2,054.36.

The question then for decision is: Can the liability on the stock be set-off against the Building & Loan Association's balance of $12,401.25?

At this point it should be noted that the owner of the stock of the Building and Loan Association had the right or option to withdraw the face value thereof with interest as a stockholder and not as a creditor, and that there was no right of set-off unless the bank as owner of the stock had prior to insolvency exercised its election or option in that regard and had changed the status of that company from stockholder to creditor.

■ My answer to the foregoing interrogatory as to right of set-off is stated as follows:

When the insolvent bank closed, the building and loan association had on deposit $12,401.25 and the bank accordingly owed the building and loan association that sum. At that time, the said association owed the bank nothing. The bank merely held in pledge stock in the building and loan association, title to which was in third parties, towit, Richards and Hershey. Assuming the stock to be withdrawable at any time, at the option of the owner, it has been decided by this court that "even after notice of withdrawal, he is a stockholder, not a creditor * * *," and whether he be a "creditor or not" the "want of a matured claim * * * was sufficient to defeat the set-off." Clardy v. Jefferson County Bldg. & Loan Association, 234 Ala. 658, 176 So. 368, 369.

In the present case, at the time the insolvent bank was taken over by the superintendent of banks as statutory receiver, it did not own the stock of the building and loan association, but merely held it in pledge with the title thereto vested in the pledgors, and with the duty to return the stock to the pledgors upon payment of their notes respectively secured thereby. The bank as pledgor could not, before default in payment of the secured notes, exercise the option or election of the pledgor-stockholders, if they had such option or election, to change the status of the pledgor from stockholders to creditors and so to mature their claim to be paid in money. Nor did the bank or the superintendent undertake to mature such claim until some nine years after the statutory receivership. At the time of the receivership the bank merely held the stock in pledge and subject to the rights of pledgors to pay their notes and have their stock returned to them. After the receivership the bank had no right or power to convert the stock into an obligation to pay money. Its rights passed to the superintendent of banks as trustee for the benefit of all creditors and were held by the superintendent in the capacity of trustee for all creditors to be disbursed ratably among all creditors.

■ It seems clear, both on principle and on authority, that the right of set-off must be determined as of the date the insolvent bank went into the hands of the superintendent of banks as statutory receiver. As to this, it is said in Dakin v. Bayly, 290 U.S. 143, 54 S.Ct. 113, 115, 78 L.Ed. 229, 90 A.L.R. 999, as follows: "As respects the set-off of cross-demands, the rights of the parties became fixed at the moment of the insolvency of the St. Petersburg bank and consequent suspension of payment, Scott v. Armstrong, 146 U.S. 499, 511, 13 S.Ct. 148, 36 L.Ed. 1059; Davis v. Elmira Savings Bank, 161 U.S. 275, 290, 16 S.Ct. 502, 40 L.Ed. 700; and the right to set off is governed by the state of things existing at the moment of insolvency, not by conditions thereafter arising, Yardley v.

Philler, 167 U.S. 344, 360, 17 S.Ct. 835, 42 L.Ed. 192, or by any subsequent action taken by any party to the transaction, Evansville Bank v. German-American Bank, 155 U.S. 556, 15 S.Ct. 221, 39 L.Ed. 259."

The state of things existing at the moment of insolvency and at the time the bank went into the hands of the superintendent of banks was that the Building and Loan Association did not owe the bank one cent which could be applied to reduce the indebtedness of the bank to said building and loan association as a depositor. The bank merely held the stock of that association in pledge and not as owner. The loan association could not, thereafter, become indebted to the insolvent bank, though the superintendent of banks, as trustee, might thereafter acquire ownership of this stock, and might, as such owner, have the privilege of converting it into money. Any subsequent action taken in the matter by any party in interest could not, under the above authority, confer the right of set-off, if such right did not exist at the time of the statutory receivership; and manifestly it did not exist.

In this connection, we wish only to refer to Fletcher on Corporations, the leading work on this subject where it is stated that a mere pledge of stock does not vest the pledgee with any rights with respect to the stock. Section 5644 of Fletcher on Corporations states as follows: "The pledgor continues to be the owner of the stock, notwithstanding the pledge, or as is often said, the general property in the stock remains in him, subject to the pledgee's lien, and until the stock is sold under foreclosure by the pledgee; * * *."

From Thompson on Corporations, Third Edition, 6, § 4249, p. 114, we quote the following: "In speaking of the distinction between a pledge and a mortgage the Supreme Court of Alabama said: 'A pledge is, when a thing is deposited as a security, to be returned to the pledgor when he has redeemed it. In this the title is retained, although the possession is parted with. In a mortgage, the title is conveyed, subject to be divested if the condition of the mortgage is performed.'" Sims v. Canfield, 2 Ala. 555; Oden v. Vaughn, 204 Ala. 445, 449, 85 So. 779.

This is what was decided in Payne v. Kendall et al., 221 Ala. 478, 129 So. 40, 41, the Court saying: "The pledgee of stock has a lien. 6 Thompson on Corps. 110;

Noles v. Marable, 50 Ala. 366; American Pig Iron Storage Warrant Co. v. German, 126 Ala. 194, 28 So. 603, 85 Am.St.Rep. 21. A pledge does not vest title in the pledgee —he has a special property; but, if not redeemed, the pledge is still a pledge. 6 Thompson, 113; National Commercial Bank v. McDonnell, 92 Ala. 387, 9 So. 149." To like effect is Smith v. Maya Corp., 227 Ala. 6, 148 So. 621.

A careful analysis of the rights given to a pledgee of stock shows that such pledgee merely has a lien on the stock. This lien is not sufficient to be considered an inchoate right or interest at a future date that may be said to have given rise to a debt ab initio and the right of set off. It follows that the acquisition of an obligation of the loan association to pay money by "subsequent action" of the superintendent of banks conferred no right of set-off which did not exist at the time of the insolvency of the bank, whether that obligation was acquired as the result of a pledge, or whether it was acquired through settlement with some debtor.

The rule permitting a set-off of mutual debts existing at the time of insolvency is an equitable one which, in effect, treats an indebtedness owing by the depositor as payment on account of what the bank owes him. For instance, if depositor had, as in this case, $12,401.25 on deposit and at the same time owed the bank $8,500 on his note or other obligation, the $8,500 is treated as a payment, leaving balance of $3,910.25 due. But where bonds, negotiable paper or stock of the character here involved is issued by the depositor and is owned by a third party and pledged to secure his debt, the indebtedness of the depositor to the bank is in no wise reduced by the fact that the bank holds such securities in pledge. These securities are assets held in trust by the statutory receiver for the benefit of all creditors and should not be devoted to one creditor by application of the doctrine of set-off. A depositor whose negotiable warehouse receipts for cotton are pledged by third parties could not claim the right to set-off the value of the cotton. There is no more reason or justice in permitting a depositor to set-off the face value of stock of the creditor here involved, or to set off the value of bonds or the face value of negotiable instruments made by the depositor and pledged by third persons. In each such instance the third party has pledged his personal property to secure his debt. The ob-

ligor in these instruments owes the pledgor, not the pledgee, and the pledgee simply holds assets which it may subsequently subject to the payment of the debts for which they are pledged. When the superintendent of banks acquires these assets by foreclosure, he acquires them for the benefit of all creditors and should not be compelled, nor allowed, to devote them to the benefit of one creditor by setting them off against the deposit of such creditor or permitting the creditor to do so.

Assuming the depositor to be solvent his obligations so acquired by the superintendent as an asset for the common benefit of the creditors is worth dollar for dollar,— in this instance $8,500. On the other hand, the obligation of the bank to its creditors, after payment of a sixteen per cent dividend, is, or may be, practically worthless. To apply the $8500 asset to the practically worthless $12,401.25 liability is in effect to give the building and loan association $8,500 of assets held by the superintendent of banks for the benefit of all creditors and in addition to give the association $1359.86 in dividends which it was not entitled to receive if its deposit be treated as paid to the extent of $8,500.

The majority opinion ignores the essential fact that at the time the bank went into the hands of the superintendent of banks, as statutory receiver, the building and loan association owed the bank no debt which could be set-off against its deposit. It ignores the fact that the rights of creditors of the bank became fixed as of the date the bank went into the hands of the statutory receiver, and the further fact that to permit the set-off arising by "subsequent action" of the superintendent of banks, in foreclosing the pledge and electing to have the stock paid in cash, operates to prefer one creditor to the detriment of others contrary to the principle that equality is equity.

The Woodlawn Building & Loan Association, therefore, was not entitled to any set-off or recoupment on account of its deposit in the defunct Woodlawn Savings Bank.

ANDERSON, C. J., and GARDNER, BOULDIN, and BROWN, JJ., concur.

FOSTER and KNIGHT, JJ., dissent.

FOSTER, Justice (dissenting).

Our understanding of the status of this situation may be explained by first assuming that at the time of insolvency of the bank it held a debt against Richards, and one against Hershey secured by a pledge of an obligation which the association owed them, respectively. We will first treat the situation as though that obligation were for the immediate payment of money. So that at that time the bank, as pledgee, could, without foreclosure of the pledge, sue the association as collateral debtor. Missouri State Life Ins. Co. v. Robertson Banking Co., 223 Ala. 13, 134 So. 25, and cases there cited.

There could be in that status no reason to suppose that in such a suit against the association it could not offset against its liability as collateral debtor the amount of the deposit owing it by the bank. The right of a pledgee to enforce payment of claims held in pledge before foreclosure is not to be confused with the liability of the pledgee as a stockholder. A pledgee of stock is not liable for its obligations until it is foreclosed and he becomes the purchaser. 7 Corpus Juris 773, section 617; Rankin v. Fidelity Ins. Co., 189 U.S. 242, 23 S.Ct. 553, 47 L.Ed. 792.

But the argument is that conceding that to be true, the effect is to reduce the debts of Richards and Hershey to the bank by the amount of such offset, for as to them it would amount to a collection of that much of their debts to the bank, and thereby reduce their value as assets of the bank, without adding corresponding value. But conceding that result, it is a status which existed at the moment of insolvency, and the debts of Richards and Hershey to the bank were subject to that value on that account by virtue of a status existing at that moment. The effect of the offset on those debts was merely the result of conditions then existing. As assets of insolvency and at the inception of the trust status under which they were held they had this burden fixed upon them. When those debts were created and the collaterals transferred, they became subject to the right of set-off and thereby was created the value of those debts as assets, and they went into insolvency in that legal status and became assets subject to that encumbrance.

When so, all the authorities agree that insolvency does not prevent the assertion of the right of set-off, and thereby no preference is created.

As we have pointed out, the fact that the liability of the association had not then matured into a status whereby it owed

money as the collateral debtor, its contract with Richards and Hershey at the time of the pledge and as a part of it was such as thereby it later became an obligation to pay money, but subject to the offset insofar as the bank was concerned in equity, because in equity it would be treated as a liability from the beginning. The equitable right of set-off was effective on it while it was a potentiality, enforceable when it ripened into an obligation to pay money. So that in no aspect has any feature of the trust fund been depreciated since the trust began by or on account of such a set-off.

KNIGHT, J., concurs in the foregoing dissent.