## YARDLEY *v.* PHILLER.

The national banks in Philadelphia organized, for their convenience, a Clearing House Association, with rules for its business set forth in detail in the statement in the opinion below. Among these rules, one provided for the deposit of securities in fixed amounts by each bank as collateral for their daily settlements; and another for the hours in the day in which settlements were to be made, and the mode of making the exchanges. The Keystone Bank made its deposit in conformity with the rule; but, having become indebted to the clearing house by reason of the receipt of clearing house certificates to a large amount, the securities deposited by it were surrendered, and were redeposited by it as security for the payment of the certificates. In the clearing of March 19, 1891, the Keystone Bank presented charges against other banks to the amount of $155,136.41, and the other banks presented charges against it for $240,549, making the Keystone Bank a debtor in the clearing for $75,359.08. In accordance with the rule, the Keystone Bank between the hours of eleven and twelve paid the $75,000 in cash or its equivalent, and gave its due bill to the manager of the clearing house for the fractional sum of $359.08, which was deposited by the manager and checked against by him as cash. In the runners' exchange of that day, the Keystone Bank owed a balance of $23,021.34, which balance it settled by giving its due bill to the manager for deposit in accordance with the system above stated. In operating the clearing on the morning of March 20, the Keystone Bank, through its runner, delivered to the respective clerks of the various banks packages containing claims held by the Keystone Bank amounting to $70,005.46, and the settling clerk of the Keystone Bank received from the runners of the other banks packages containing $117,035.21, leaving the Keystone Bank debtor in the clearing for $47,029.75. The packages containing the demands which the Keystone Bank held against other banks, and which had been delivered to the agent of each of those banks, were by them taken away at the termination of the clearing. The packages containing the charges presented against the Keystone Bank, which in the aggregate amounted to $117,035.21, instead of being taken away by its settling clerk, were, under the arrangement which we have stated, turned over by him to the

manager of the clearing house, to be retained until at the hour named the Keystone Bank paid the balance due by it. Before the hour for making the payment, however, the Keystone Bank, by order of the Comptroller of the Currency, was closed, and subsequently was placed in the hands of a receiver. On the failure of the Keystone to make the payment of $47,029.75, the committee of the association instructed the manager to call on the banks, by whom claims had been presented against the Keystone, "to redeem the packages against the Keystone Bank." The manager thereupon gave the proper notification, and the various banks notified sent their checks and redeemed the packages in question. Among the obligations for $117,035.21, however, were due bills amounting to $41,197.36. These due bills came from the fractional amounts arising by the settlement made on the morning of the 19th, to wit, $359.08; for the due bill given at the runners' settlement on the morning of the 19th, $23,031.44; and for due bills given to various banks during the course of business on the 19th, amounting to $17,806.84. Thereupon, and as part of the same transaction, the manager paid from the $70,005.36, which by his settlement sheet appeared to the credit of the Keystone as owing from other banks to the Keystone Bank for the checks surrendered by that bank, the amount of the due bills referred to, viz., $41,197.36. This left to the credit of the Keystone the sum of $28,808.10, and this amount was by the manager, acting under direction of the committee of the association, credited on the loan certificate account of the Keystone Bank with the association. In a suit by the receiver of the bank to determine the rights of the parties, *Held*, (1) That the claim of the receiver that the Keystone Bank was entitled to be paid $70,005.36 of credit, irrespective of the outstanding due bills which it had been expressly agreed between the parties were to be paid by way of set-off in the clearing, was without foundation; (2) That the Clearing House Association, having been in possession of the $28,808.10 as the fiduciary agent of the Keystone Bank without a lien or right upon it, its appropriation of the same after the insolvency of the Keystone Bank to the debt owing for loan certificates was obviously a preference within the inhibition of the statute against preferences in the cases of insolvent banks, Rev. Stat. § 5242.

THE case is stated in the opinion.

*Mr. H. B. Gill* and *Mr. Silas W. Pettit* for appellant.

*Mr. A. T. Freedley* and *Mr. John G. Johnson* for appellees.

MR. JUSTICE WHITE delivered the opinion of the court.

The Clearing House Association of Philadelphia is a voluntary organization, created by the coöperation of national banks

doing business in that city. Its affairs are governed by rules and regulations adopted by agreement between the banks forming the association, and the general direction of its operation is under the control of a president, secretary and manager, and of a committee selected by the members of the association. As the name of the association implies, it is intended to afford a uniform and convenient method by which daily settlements of balances can be had between the banks entering into the association. In addition to the function of affording a means for the daily clearing of balances, the Clearing House Association, by agreement among its members, issued, at periods when it was deemed best to do so, clearing house certificates. These certificates were delivered, under the discretion of the managers, when applied for by a member of the association, and were secured by the pledge of bills receivable or assets taken from the portfolio of the bank obtaining the certificates. These certificates were available as cash in settlements between the banks and for other purposes, and the object of issuing them was, in times of panic or stringency, to create, to the extent of the certificates, solidarity of responsibility between the banks, as each bank was liable for a proportionate share of the certificates in case of default in their payment, thus fortifying the credit of one by the credit of all. Moreover, the certificates afforded a means by which a bank with good assets could use them in order to obtain certificates which were, for banking purposes, the equivalent of cash, when, from any stringency or panic, the assets themselves, although entirely sound, could not be readily convertible into current money.

Article 2 of the constitution of the Clearing Association provided as follows:

"ART. 2. Its object shall be to effect at one place the daily exchanges between the several associated banks, consisting of a morning exchange and a runner's exchange, and the payment, at the same place, of the balances resulting from such exchanges. The responsibility of the association for such exchanges is strictly limited to the faithful distribution by the manager, among the creditor banks for the time being, of

the sums actually received by him; and should any losses occur while the said balances are in the custody of the manager, they shall be borne and paid by the associated banks, in the same proportion as the expenses of the clearing house, as hereinafter provided for."

Article 11 said:

"ART. 11. Should any of the associated banks fail to appear at the clearing house at the proper hour, prepared to pay the balance against it, the amount of that balance shall be immediately furnished to the clearing house by the several banks exchanging at that establishment with the defaulting bank, in proportion to their respective balances against that bank, resulting from the exchanges of the day, and the manager shall make requisitions accordingly, so that the general settlement may be accomplished with as little delay as possible. The respective amounts so furnished the clearing house on account of the defaulting bank will, of course, constitute claims on the part of the several responding banks against that bank: *Provided,* That the amount of the due bill given by the defaulting bank, in settlement of its debit balance in the runner's exchange of the previous day, and deposited by the clearing house in its depository bank, shall be deducted from the total charge of such bank, and shall be the first claim against the securities deposited by the defaulting bank, under article 17."

Article 17 was as follows:

"ART. 17. Each bank, member of the Clearing House Association, shall deposit securities with the clearing house committee as collateral for their daily settlements, in the following percentage or assessment on capital:

"1st. Banks with capitals of $800,000 and over, ten per cent.

"2d. Banks with capitals of $500,000 and under $800,000, fourteen per cent; but not to be required to deposit over $80,000.

"3d. Banks with capitals over $250,000 and under $500,000, twenty per cent; but not to be required to deposit over $70,000.

"4th. Banks with capitals of and under $250,000 shall deposit not less than $50,000.

"The committee shall apply the deposit of any defaulting bank to the payment of the balance due by such bank at the clearing house, or to the reimbursement, *pro rata*, of the several banks furnishing said balance, under article 11; and the surplus, if any, shall be held as collateral security for other indebtedness to members of this association."

By article 9 of the constitution the hour for making the morning exchange at the clearing house was fixed at eight and a half o'clock, and the hour for making the runners' exchange at half-past eleven. By the same article it was provided that a bank becoming a debtor by the morning clearing must pay the sum debited to it to the clearing house between the hours of eleven and twelve o'clock that day, and at twelve and a half o'clock of the same day the bank being a creditor in the daily clearing should receive from the manager of the clearing house the sum of the credit to which it was entitled. The settlement at the runners' exchange was made by due bills, and these due bills were deposited by the manager of the clearing house in his bank account, kept with one of the banks belonging to the association, and were checked against by him as if the due bill were cash. Such due bill, when so received on deposit by the bank and treated by it as cash, became a credit item, presented by it, in the clearing of the following morning. In addition, where claims were presented by the runner of one bank for payment to another bank during the course of a business day, the bank by whom the money was to be paid, to obviate the risk of carrying it, instead of handing over money, gave to the runner a due bill for the amount, which, on its face, was stipulated to be payable in the clearing of the next day.

The Keystone National Bank was a member of the Clearing House Association. It deposited with the association, in accordance with the rules, securities to guarantee its obligation to meet its daily clearing. It had obtained, moreover, from the Clearing House Association clearing house certificates to a large amount, and in December, 1890, by an agreement

between the association and the Keystone Bank, the securities deposited by the Keystone Bank to guarantee its liability to pay any balance arising from the daily clearing, were returned to that bank, and were by it deposited anew with the Clearing House Association as security for clearing house certificates. It resulted from this transaction that the Keystone Bank did not have in the hands of the Clearing House Association any security to guarantee its obligation to meet its daily clearing. At the time, however, when the securities were withdrawn and used by the Keystone for the purpose of securing clearing house certificates, an agreement was made that in order to secure the performance of any obligation which might arise from the daily clearing the Keystone Bank would leave in the hands of the manager of the clearing house the vouchers presented by other banks against it at the time the clearing was made, to be held by the manager until the balance shown to be due by it in the clearing was paid in accordance with the agreement. From December, 1890, until the 20th of March, 1891, in execution of this agreement, whenever in the daily clearing the Keystone Bank owed a balance, it did not take away the vouchers delivered to its settling clerk, but they were turned over to the manager of the clearing house to be held until the obligation of the Keystone Bank resulting from the clearing was made good.

The operation of making the clearing was accomplished by the following method: At the hour named a runner and a settling clerk representing each bank met at the clearing house. These representatives of the respective banks brought with them, in separate sealed packages, the checks which the banks they represented held against other banks. The runner of each bank thereupon delivered to the settling clerk of the others these packages, taking receipts therefor, so that at the common place of meeting the clerk of each bank received from every other bank the checks drawn against the bank he represented. The making up of these packages for exchange is thus provided for in the rules:

"Rule III. Sealed packages, well gummed and sealed with wax and endorsed with ink or indelible pencil, shall be used

exclusively in the morning exchange and in the runners' exchange, and the amounts stated thereon shall be the basis of settlement. These packages, with the seals unbroken, shall be delivered by the messengers of the several banks to their respective institutions; otherwise, no responsibility shall attach to the sender."

After these packages had been received the settling clerk of each bank made up from the indorsements on the packages delivered to him the debits, and stated the credits arising from the sum of the packages delivered by the runner of his bank to the settling clerks of the other banks. The sheets thus made up were then turned over to the manager of the clearing house, by whom they were verified and consolidated. The manager's balance sheet hence, necessarily, contained a statement itemizing the aggregated debits and credits of all the banks concerned in the clearing. Where any fractional sum was due by a bank in consequence of the clearing, this fractional sum was paid to the manager by a due bill, the manager treating this due bill as cash, deposited it in the bank where his account was kept and the sum of this due bill became a credit item in favor of the bank holding it in the clearing of the next morning.

In the clearing of the 19th of March, 1891, the Keystone Bank presented charges against other banks to the amount of $155,136.41, and the other banks presented charges against it for $240,549, making the Keystone Bank a debtor in the clearing for $75,359.08. In accordance with the rule, the Keystone Bank between the hours of eleven and twelve paid the $75,000 in cash or its equivalent, and gave its due bill to the manager of the clearing house for the fractional sum of $359.08, which was deposited by the manager and checked against by him as cash. In the runners' exchange of that day, that is, the 19th of March, the Keystone Bank owed a balance of $23,021.34, which balance it settled by giving its due bill to the manager for deposit in accordance with the system above stated. In operating the clearing on the morning of March 20, the Keystone Bank, through its runner, delivered to the respective clerks of the various banks packages

containing claims held by the Keystone Bank amounting to $70,005.46, and the settling clerk of the Keystone Bank received from the runners of the other banks packages containing $117,035.21, leaving the Keystone Bank debtor in the clearing for $47,029.75. The packages containing the demands which the Keystone Bank held against other banks, and which had been delivered to the agent of each of those banks, were by them taken away at the termination of the clearing. The packages containing the charges presented against the Keystone Bank, which in the aggregate amounted to $117,035.21, instead of being taken away by its settling clerk, were, under the arrangement which we have stated, turned over by him to the manager of the clearing house, to be retained until at the hour named the Keystone Bank paid the balance due by it.

Before the hour for making the payment, however, the Keystone Bank, by order of the Comptroller of the Currency, was closed, and subsequently was placed in the hands of a receiver. On the failure of the Keystone to make the payment of $47,029.75, the committee of the association instructed the manager to call on the banks, by whom claims had been presented against the Keystone, " to redeem the packages against the Keystone Bank "; in other words, " to redeem the amounts which they had been credited with on the manager's balance sheet, in settlement of the account of checks drawn on the Keystone Bank." Not being able from his records to ascertain what banks to call upon to make the payment of $117,035.21, the manager sent to the Keystone Bank, and received from that institution their settlement and package sheets for that day. On receipt thereof, the manager thereupon gave the proper notification, and the various banks notified sent their checks and redeemed the packages in question. Among the obligations for $117,035.21, however, were due bills amounting to $41,197.36. These due bills came from the fractional amounts arising by the settlement made on the morning of the 19th, to wit, $359.08 ; for the due bill given at the runners' settlement on the morning of the 19th, $23,031.44 ; and for due bills given to various banks during the course of

business on the 19th, amounting to $17,806.84. Thereupon, and as part of the same transaction, the manager paid from the $70,005.36, which by his settlement sheet appeared to the credit of the Keystone as owing from other banks to the Keystone Bank for the checks surrendered by that bank, the amount of the due bills referred to, viz., $41,197.36. This left to the credit of the Keystone the sum of $28,808.10, and this amount was by the manager, acting under direction of the committee of the association, credited on the loan certificate account of the Keystone Bank with the association. The result of the transaction was a reduction of the claims which had been originally made against the Keystone Bank in the exchanges of the 20th of March, 1891, from $117,035.21 to $41,197.36, and a return to the various banks of $75,837.85 of checks and drafts received from their customers. Whilst the record does not affirmatively show the fact, it is fairly inferable from it that these checks, etc., aggregating $75,837.85, were immediately charged back by the banks by whom they had been received and were returned to the depositors from whom they had received them, and therefore reached ultimately the drawers, who were depositors in the Keystone Bank, thus leaving the Keystone Bank liable for their amount in its deposit account with its depositors.

On February 19, 1894, the receiver of the Keystone Bank filed his bill in this cause in the Circuit Court of the United States for the Eastern District of Pennsylvania, setting forth the relations between the Keystone Bank and the clearing house, and detailing the transactions of the 20th of March, 1891, substantially as we have stated them; alleged an appropriation by the association to its own use, after the insolvency of the Keystone Bank, and in violation of the statutes of the United States, of the checks and drafts which had been surrendered at the clearing house by the Keystone Bank on the morning of the 20th of March, as hereinbefore stated, and also alleging an appropriation and application to the use of the association of bonds of the Baltimore Traction Railway Company of the par value of $100,000, which it was claimed had been specifically deposited by the Keystone Bank as security

for the payment of any balance which might be owing by it in the daily clearing. It was averred that demand had been made on the association, and that it had refused to account to the receiver for the said checks, drafts and bonds. A discovery was asked and relief prayed that the association surrender the checks, drafts and bonds, or, in the alternative, that the association be decreed to pay the amount collected thereon with interest. The answer of the association detailed most of the facts heretofore recited and averred the lawfulness of the appropriation made of the $70,005.36. As to the traction bonds, it was averred that they were deposited as security for loan certificates, and that they had been sold and the proceeds duly accounted for in the account as to such certificates. The claim of the receiver as to these bonds was subsequently abandoned.

A decree was entered in the Circuit Court adjudging that the receiver recover from the defendants $70,005.36 with interest from March 20, 1891. 58 Fed. Rep. 746. On appeal, the Circuit Court of Appeals reversed that decree, and remanded the cause to the trial court with directions to dismiss the bill of complaint. 17 U. S. App. 647. From this latter decree an appeal was taken to this court. The opposing judgments rendered by the Circuit Court and by the Circuit Court of Appeals well define the conflicting contentions of the parties, since the conclusion of the Circuit Court entirely sustained the position taken by the complainant while the Court of Appeals justified the rights asserted by the defendants.

The receiver of the Keystone Bank argues that the result of the transactions at the clearing house on March 20, 1891, after the failure of the bank, was to wholly dismiss the Keystone Bank from the clearing and leave it with a claim of $70,000 against the clearing house, which it is entitled to have paid in full without reference to all or any of the debts due by it, which otherwise would have been properly chargeable in the clearing. In other words, the Keystone Bank, although it put into the clearing only claims against other banks sufficient to partially discharge its obligations, and failed subsequently to perform the duty, owing by it, to pay

in cash a sum adequate to make up the difference, that is, to discharge all its debts resulting from the clearing, asserts that as a consequence of its failure to pay all it has been absolved from thereafter paying anything whatever in the clearing. Or, stated in another form, the argument is this: As the banks which held checks on the Keystone Bank, when they received these checks from the clearing house, charged them back to their depositors, and therefore made them obligations due by the Keystone Bank on its deposit account with its depositors, these banks elected to consider the Keystone Bank as no longer connected with the clearing house, and hence also lost their right to compensate the credit of the Keystone Bank by such other obligations, outside of the checks, which were properly entitled to and had actually figured in the clearing, such as due bills, etc., which these banks had not charged back, because they were not of the nature to be so charged, as they were when presented in the morning clearing held by the banks for their own account. It is clear then that the claim of the receiver of the Keystone Bank is that, by the default of that bank, its liability to have its claim in the clearing compensated by its due bills held by other banks was cancelled, and hence that it was in a much better position by its failure than it would have been if it had not suspended and had furnished the funds to pay all the claims presented against it in the clearing.

On the other hand, the claim of the Clearing House Association is that it owes nothing, and that by the default of the Keystone Bank the clearing house became entitled to appropriate the balance of the credit due the Keystone Bank in the clearing, to debts due to the clearing house, although such debts were not of a nature to have authorized them to be charged against the clearing if the failure had not taken place. That is, the clearing house also contends that the effect of the failure was to give it rights against the Keystone Bank which it would not have had if the failure had not taken place.

The claims of both parties, therefore, when analyzed, amount to the assertion, as a proposition of law, that they both have greater rights in consequence of the insolvency than they

would have had if the insolvency had not taken place. The self-evident error of this proposition points to the unsoundness of the claims of both parties to the controversy.

We will demonstrate that this is the case by considering the situation of the parties in order thereby to determine their respective rights against and obligations towards each other. A clear ascertainment of the legal status of the parties will be at the outset greatly facilitated by first considering a matter much discussed in argument, viz.: what, if any, bearing the payment of $117,035.21 to the manager of the clearing house by sundry members of the association has upon this controversy.

In the manager's settlement sheet of the daily clearings between the banks, made up from the data contained in the settlement sheets prepared by the settling clerk of each bank at the close of the clearing, there was set out in the centre of the sheet, running from top to bottom, a list of banks, each bank being given a number ranging from 1 to 43. In a column to the left of the number and name of each bank there was a list of debit items, each item indicating that the sum stated was owing from the bank opposite to which it was placed, for checks and drafts and due bills which had been presented against that bank by other banks in the association. The banks which had presented these checks, drafts and due bills were given credit therefor on the credit side of the sheet, in a column to the right of the name of each bank, as being claims in their favor against the debit items due from other banks. The aggregate of the debit items was therefore the fund from which the aggregate of the credit item was to be paid. The two necessarily balanced each other.

If, as the result of the failure of the Keystone Bank and the return to the banks, which had presented them, of the packages in question, the sum of $117,035.21 had been stricken from the debit side of the manager's sheet, the effect necessarily would have been that the totals on the credit side would have been just that much greater than the total of the debit side, and, therefore, there would have been a shortage of that amount in the execution of the clearing. It follows that in paying the aggregate credits the manager of the clearing house would

have been short that much money. In other words, to have paid the banks who had presented the checks against the Keystone Bank the sum of their claims against all the banks in the association, as shown by the credit side of the manager's sheet, the manager necessarily would have had to make good the shortage by paying less to that amount to the banks who had received an increased credit because of the expected payment of the debit item charged against the Keystone. That is to say, the deficiency on the credit side which would have resulted from taking out the $117,035.21 debit due by the Keystone would have caused the loss to fall on the banks which had presented the claims against the Keystone, because they would have received that much less on the aggregate amount due to them from the entire clearing, that is, from all the other banks. Instead of doing this, however, and in order to render his settlement regular in form, the manager called upon the banks who had presented the claims against the Keystone Bank to substitute money for these claims, so that this money, paid in by them in response to the call, might take the place of the amount of $117,035.21, and thus cause the debit and credit side to agree, and enable him to carry out the clearing just as it had been made in the early morning. The effect of this was not to change the situation at all, since if the $117,035.21 had not been paid in, the loss would have fallen on the banks who had received credit, because they had presented claims against the Keystone amounting to $117,035.21. It results that by paying in the amount called for and having it put fictitiously on the sheet, in lieu of the $117,035.21 due from the Keystone Bank the banks paying in the amount neither gained nor lost, since they immediately received back the amount when the clearing was carried out. Whilst the transaction then assumed the form of a payment of $117,035.21 by the banks called upon, it was in reality no payment at all, for it simply enabled the money paid in to be considered as on one side of the account in order to be handed back to them on the other. This is the inevitable result of the transaction, which, besides, is clearly shown by the testimony of Mr. Boyd, the manager of the clearing house, who

says that the payment of the $117,035.21 *was a mere matter of bookkeeping*.

When it is understood that the payment in of the money in consequence of the call made upon the banks was in reality no payment at all, since it was but the giving on the one hand to the manager of a sum of money to be handed back by him on the other in order that his settlement sheet might balance, it becomes perfectly clear that the result was in no way to change or destroy the credit of $70,005.36 standing on the clearing sheet in favor of the Keystone Bank. This latter amount was the sum of checks which the Keystone Bank had surrendered at the morning exchange to the settling clerks of the banks upon which such checks were drawn. As a result of such surrender, the Keystone Bank was entitled to receive out of the debits paid by other banks the sum named. The banks which owed that sum were charged in the debits as owing that amount to the clearing house, and when, as they did, they settled their indebtedness to the clearing house the manager thereof necessarily received that sum for account of the Keystone Bank. The banks which for mere bookkeeping purposes had paid in a sum of money and at once received it back certainly cannot be permitted to claim that the effect of this transaction was to destroy the rights of the Keystone Bank on the credit side of the clearing, which rights of necessity resulted from the paying into the clearing house of the aggregate debits.

But these banks who paid in their money, under the call, and received it back, whilst they were not in a position, in consequence of having done so, to enable them to assert that the credit of the Keystone had disappeared, were certainly not thus put in a position by which they could not exercise their lawful claims upon the credit of the Keystone. The claims which, as we have seen by the rules of the clearing house and the contracts between the parties, were to be mutually compensated, in the clearing, one with the other, were the due bills and the items of bankers' exchange checks, drafts, etc. The $117,035.21 against the Keystone Bank contained $75,837.99 of checks and drafts, and the remainder

consisted of due bills. These checks and drafts, on the failure of the Keystone Bank, were charged back by the banks who held them to those who had deposited them, and in consequence, presumably, ultimately reached the hands of the depositors of the Keystone, by whom the checks were drawn. The right of the bank holding a check against the Keystone Bank, on the failure of that bank, to charge back the checks was unquestionable. Indeed, it was not only to the interest, but it was the duty, of the banks towards their stockholders to do this, for if they had held the checks, without charging them back, they would have become responsible for them, and therefore would have assumed a debt which they were under no obligation to assume. Having exercised the right to return the checks, there arose a resulting obligation on the banks not to continue to present against the Keystone Bank, for payment out of its credit in the clearing, obligations for which there was no longer a right to make a claim. Deducting, therefore, the $75,837.99 of checks, it left only the due bills, $41,197.26, which were paid by the manager of the clearing house out of the $70,005.36 to the credit of the Keystone Bank. This payment of course extinguished the due bills and reduced the credit of the Keystone Bank ($70,005.36) to the extent of the payment of $41,197.26. leaving, therefore, a balance to the credit of the Keystone Bank of $28,808.10 unappropriated by anything resulting from or entering into the clearing. This sum the Clearing House Association at once appropriated in reduction of an indebtedness due it by the Keystone Bank upon the loan certificate account, an account which had arisen from loan certificates which the Keystone Bank had previously obtained from the clearing house, secured by collaterals, as already stated.

From the foregoing it obviously results that the claim of the receiver that the Keystone Bank was entitled to be paid $70,005.36 of credit, irrespective of the outstanding due bills which it had been expressly agreed between the parties were to be paid by way of set-off in the clearing, is without foundation. This conclusion leaves only for consideration the question whether the Clearing House Association possessed the

right to appropriate and impute the $28,808.10 of balance in its hands and due to the Keystone Bank towards the payment of the indebtedness of the Keystone Bank for loan certificates.

It is undisputed that there was no agreement between the clearing house and the Keystone Bank by which the sums due to the latter, in the clearing, could be applied to the loan certificate account. It is obvious that the Clearing House Association was an agent and fiduciary representative of all the banks forming the association. When the nature of the loan certificates and the relation of the Clearing House Association to its members is thus understood, the question whether the Clearing House Association had a right to take as it did the clearing credit of the Keystone and apply it to the debt in question, in reason, answers itself. As said in *Reynes* v. *Dumont*, 130 U. S. 354, 391, "A general lien does not arise upon securities accidentally in the possession of a bank, or not in its possession in the course of its business as such, or where there is a particular mode of dealing, inconsistent with such general lien."

The Clearing House Association having been therefore in the possession of the $28,808.10 as the fiduciary agent of the Keystone Bank without a lien or right upon it, its appropriation of the same after the insolvency of the Keystone Bank to the debt owing for loan certificates was obviously a preference within the inhibition of the statute against preferences in the cases of insolvent banks. Rev. Stat. § 5242.

But want of power in the clearing house to absorb the $28,808.10 belonging to the Keystone necessarily follows, even if we eliminate from view all claim of lien or all question of fiduciary relation, and consider the matter solely under the principles of the general law of set-off. It is certain that all or any portion of the $70,005.36 entered on the clearing sheet and resulting from the claims presented against other banks by the Keystone Bank, in the clearing of that morning, was a debt due by the clearing house, not to the Keystone Bank, but to the other banks who had presented claims against the Keystone in excess of the $70,005.36. This is shown by the

fact that up to the time of the insolvency not only did the Keystone Bank have no claim against the clearing house, but it was under obligation to pay $47,029.75, the difference between the sum which it had presented and the sum of the claims presented against it. Not only, therefore, all of the $70,005.36 presented by the Keystone Bank in the clearing, but the $47,029.75, which it had to pay, belonged to other banks, and hence up to the time of the insolvency the Keystone was a debtor and not a creditor. The credit of $28,808.10 which the clearing house impounded arose as a result of the transactions between the parties, after the announcement of the insolvency of the Keystone was made, that is, the credit of $28,808.10 was solely caused by the withdrawal, after the insolvency, by certain banks of checks and drafts which they held against the Keystone Bank. It was only when, in consequence of the failure of the Keystone to pay the sum due by it to the other banks, and thereupon these banks exercised their undoubted right to make this withdrawal, and charge back to the persons from whom they had received them the checks and drafts against the Keystone, that that credit in the favor of the Keystone arose. But this withdrawal was confessedly made after the declared insolvency, and hence the credit which the withdrawal caused could only have arisen after that time. The claim of the clearing house, therefore, is that a fund put in its hands for account of certain banks having become the property of the Keystone after the insolvency of the latter, by a partial release granted by the banks in whose favor the fund existed, therefore there instantly arose on the part of the clearing house a right to set off its certificate account held against the Keystone by the sum of the fund so created after insolvency. But, obviously, the right to set off, as recognized in *Scott v. Armstrong*, 146 U. S. 499, is to be governed by the state of things existing at the moment of insolvency, and not by conditions thereafter created. The case under this aspect is directly controlled by *Nashville Security Bank v. Butler*, 129 U. S. 223, and, indeed, is governed by the general principle announced in *Davis v. Elmira Savings Bank*, 161 U. S. 275.

Whilst, however, we find the appropriation of the $28,808.10 to have been unlawful, the record is not in such a shape as to enable us to dispose finally of the controversy. As we have said, the bill of the complainant sought not only the recovery of the entire $70,005.36 credit shown on the manager's clearing sheet, but also an accounting for certain bonds which it was claimed had been held by the clearing house as collateral for the payment of the daily balances in the clearing. The proof having shown that these collaterals were not held as security for the clearing but for the loan certificates, this claim was abandoned. But from the evidence offered in relation to this item and found in the record, there is a statement of the condition of the loan certificate account between the clearing house and the Keystone Bank or its receiver. This statement shows that after reducing the loan certificate account by the $28,808.10 credit, resulting from having appropriated the balance in the clearing, as above stated, and after having realized on certain assets held as collateral for that account, there was a balance of $9695.62 in cash to the credit of the Keystone Bank or its receiver. That is to say, after putting the clearing house in funds to discharge all the loan certificates, it had in cash nearly ten thousand dollars to the credit of the receiver. The statement moreover shows that in addition to this cash there were in the hands of the clearing house collaterals held for the loan certificates and which had not been realized, amounting to $331,941.47, and besides that there was a balance due on collateral notes, in process of collection, amounting to $16,397.72. Necessarily, if the appropriation made by the clearing house of the $28,808.10 be stricken from the loan certificate account, the amount due to the Clearing House Association by the Keystone or its receiver will be increased by that amount, and this would absorb the sum of $9695.62 credited thereon as shown by the account in the record, and leave a balance besides against the Keystone. The uncollected collaterals would, of course, be a guarantee for the payment of the balance, and the ultimate sum due, after exhausting all the collaterals, would be a claim against the receiver, entitled to its distributive share from the

assets of the Keystone Bank. The record fails to disclose whether the receiver of the Keystone Bank has taken the collaterals and the balance of cash stated in the account. If he has, the issues are settled, for plainly he cannot be permitted, after having taken the collaterals or the cash balance, upon the theory that the loan certificate account has been extinguished by imputing thereto the $28,808.10, and then in this suit seek to recover by repudiating the credit.

We conclude, therefore, that the ends of justice require that the result of the dealings between the parties should be ascertained and settled before a final decree passes, and that to accomplish this purpose

*It will be necessary to reverse both the decrees of the Circuit Court of Appeals and of the Circuit Court, and to remand the cause with directions to allow the parties if necessary to reform their pleadings so that their rights may be determined in conformity with the foregoing opinion, the costs of the Circuit Court of Appeals to be borne by the receiver, those of this court by the appellees, those in the Circuit Court to abide the final result.*

