**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Penn Square Bank, N.A., Plaintiff-Appellant,**

v.

**The LIBERTY NATIONAL BANK & TRUST CO., Defendant-Appellee.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Penn Square Bank, N.A., Plaintiff-Appellant,**

v.

**UTICA NATIONAL BANK AND TRUST COMPANY, Defendant-Appellee.**

Nos. 84–2147, 84–2148.

United States Court of Appeals,
Tenth Circuit.

Nov. 26, 1986.

David L. Bryant (Charles C. Baker, also of Gable & Gotwals, Tulsa, Okl., with him on the briefs in No. 84–2147; Ross A. Plourde and V. Burns Hargis of Reynolds, Ridings & Hargis, Oklahoma City, Okl., on the briefs in No. 84–2148), for plaintiff-appellant Federal Deposit Ins. Corp.

D. Kent Meyers (Harvey D. Ellis, Jr., also of Crowe & Dunlevy, Oklahoma City, Okl., with him on the brief), for defendant-appellee The Liberty Nat. Bank and Trust Company of Oklahoma City.

William E. Hughes (Lewis N. Carter and Charles S. Plumb, also of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., with him on the brief), for defendant-appellee Utica Nat. Bank & Trust Co.

Before McKAY and LOGAN, Circuit Judges, and CROW, District Judge.*

LOGAN, Circuit Judge.

These two consolidated appeals raise substantially identical questions regarding the rights of standby letter of credit beneficiaries in bank insolvency proceedings. In both cases, the Federal Deposit Insurance Corporation (FDIC) appeals from summary judgments entered against it as receiver of the insolvent Penn Square Bank, N.A. (Penn Square).

The issues on appeal are: (1) whether Utica National Bank and Trust Company (Utica) and The Liberty National Bank and Trust Company (Liberty) possess provable claims against the FDIC under standby letters of credit issued by Penn Square, even though they did not attempt to draw on the letters of credit until after Penn Square was declared insolvent; (2) whether Utica and Liberty properly set off their claims against correspondent accounts maintained by Penn Square at the respective banks; and (3) whether Utica is entitled to recover $100,000 in deposit insurance proceeds from the FDIC in the FDIC's capacity as insurer.

I

The material facts in these cases are not in dispute. We present them separately.

A

*FDIC v. Utica*

On July 5, 1982, the Comptroller of the Currency declared Penn Square insolvent and appointed the FDIC as its receiver. Before that date, Penn Square had issued thirty-seven standby letters of credit to Utica as beneficiary to serve as collateral for loans which Utica made to its loan customers. Each letter of credit was payable upon Utica's presentment of a draft accompanied by a certification that the loan secured by the letter was in default. The letters of credit were backed by promissory notes executed by Penn Square's customers. On July 5, 1982, the aggregate, undrafted balance under the letters of credit was $2,962,889.44. Between July 14 and July 23, 1982, the FDIC sent notices to Utica purporting to disaffirm all obligations of Penn Square under the letters of credit. Taking the position that the loans were all in default on July 5, 1982, most because Penn Square's insolvency rendered questionable the collateral securing the loans, Utica presented complying drafts to the FDIC for payment of the remaining balance under the letters, before Penn Square made any distributions to creditors. The FDIC refused to honor the drafts. Utica then notified the FDIC that it had set off as much of the amounts claimed under the letters of credit against Penn Square's correspondent account at Utica as it could, reducing the account balance to zero.

Thereafter, the FDIC sued Utica to recover $1,609,261.93, which the FDIC claimed to be the amount properly remaining in Penn Square's correspondent account at Utica.[1] Utica asserted its right to setoff as a defense and counterclaimed for deposit insurance and the balance due under the letters of credit. The district court declared Utica's setoff proper and awarded Utica $100,000 in deposit insurance and a receiver's certificate in the amount of $1,478,762.04 for the uninsured balance.

B

*FDIC v. Liberty*

On July 5, 1982, the date Penn Square was declared insolvent, Liberty was the

---

* The Honorable Sam A. Crow, United States District Judge for the District of Kansas, sitting by designation.

1. In addition to $1,384,127.40 set off under the letters of credit, the FDIC also sought recovery of $225,000 debited from Penn Square's account in connection with the sale by Utica to Penn Square of certain promissory notes. There was also a dispute over approximately $135 in participated loan proceeds which the FDIC claimed had been improperly withheld by Utica. The district court implicitly awarded these amounts to Utica on its counterclaim for the balance remaining due under the letters of credit after setoff. These issues were not raised on appeal and we therefore do not consider them.

named beneficiary of four standby letters of credit issued by Penn Square, each in the amount of $400,000. Liberty was also entitled to draw under a fifth letter of credit in the amount of $28,125, which had been transferred to it by the named beneficiary. These letters of credit were payable upon Liberty's presentment of a draft and a certificate of default. Liberty asserts, and the FDIC does not dispute, that the obligations secured by these five letters were in default on or before July 5, 1982, by reason of Penn Square's insolvency or otherwise. Between July 8 and July 13, 1982, Liberty presented drafts totalling $1,455,058.54 to the FDIC for payment under the five letters. The FDIC dishonored these drafts, and Liberty set off the total amount against Penn Square's correspondent account.

In addition, Liberty was a "confirming bank" with respect to a sixth letter of credit in the amount of $175,000, issued by Penn Square to the First National Bank and Trust Company of Oklahoma City. This letter of credit also was payable upon presentment of a draft referring to and accompanied by the letter. On July 9, 1982, Liberty paid a $175,000 draft drawn on it as confirming bank under this letter and, on the same day, presented its draft in that amount to the FDIC. When this draft was also dishonored by the FDIC, it was set off by Liberty against Penn Square's account. On July 14, 1982, Liberty wired to Penn Square $656,356.19 as the final balance in its correspondent account after the setoffs.

Thereafter the FDIC sued Liberty to recover $1,632,172.12, the total amount debited against Penn Square's correspondent account after the date of insolvency.[2] The district court declared Liberty's setoffs proper and granted its motion for summary judgment.

## II

The FDIC first argues that because Utica and Liberty (defendants) did not draw on the letters of credit until after Penn Square was declared insolvent, their claims were not "fixed" but "contingent" at the date of insolvency, and therefore are not provable against the FDIC as receiver.

The FDIC relies upon statements in many cases to the effect that "the rights and liabilities of a bank and the bank's debtors and creditors are fixed at the declaration of the bank's insolvency," *see, e.g., American National Bank v. FDIC,* 710 F.2d 1528, 1540 (11th Cir.1983) (quoted in *FDIC v. McKnight,* 769 F.2d 658, 661 (10th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986)), and that no additional rights can be created after insolvency. *See, e.g., Merrill v. National Bank of Jacksonville,* 173 U.S. 131, 143, 19 S.Ct. 360, 365, 43 L.Ed. 640 (1899).[3] An early Supreme Court case, *United States ex rel. White v. Knox,* 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884), stated the principle as follows:

> "The business of the bank must stop when insolvency is declared. R.S., sec. 5228. No new debt can be made after that. The only claims the Comptroller can recognize in the settlement of the affairs of the bank are those which are shown by proof satisfactory to him or by

2. This amount includes $2113.58 debited by Liberty for various services performed for Penn Square and Penn Square's customers. Claims for those services are not at issue here.

3. A similar rule applies in bankruptcy. *United States v. Marxen,* 307 U.S. 200, 207, 59 S.Ct. 811, 815, 83 L.Ed. 1222 (1939) ("the rights of creditors are fixed by the Bankruptcy Act as of the filing of the petition in bankruptcy"); *accord Allen v. See,* 196 F.2d 608, 610 (10th Cir.1952). Nevertheless, contingent claims have long been held allowable in bankruptcy, provided they become fixed or capable of reasonable estimation within the time provided for determining such allowance. *See* 11 U.S.C. § 502(c), (e)(2); *Maynard v. Elliott,* 283 U.S. 273, 278–79, 51 S.Ct. 390, 392, 75 L.Ed.2d 1028 (1931) (allowing claims against bankrupts as endorsers of promissory notes falling due after the petitions were filed; claimant need not give notice of dishonor to share in the estate); *Employees' Retirement System v. Osborne (In re THC Financial Corp.),* 686 F.2d 799, 803 (9th Cir.1982) ("every court that has considered the allowability of a contingent claim has found the claim allowable" in bankruptcy).

the adjudication of a competent court *to have had their origin in something done before the insolvency."*

*Id.* at 787, 4 S.Ct. at 687, 28 L.Ed. at 603 (emphasis added).

■ To ensure a "ratable" distribution of assets, as required by 12 U.S.C. § 194, the Supreme Court has held that the amount of each claim is to be determined as of the date of insolvency. *Knox,* 111 U.S. at 785–88, 4 S.Ct. at 686–87, 28 L.Ed. at 603–04; *American Surety Co. v. Bethlehem National Bank,* 314 U.S. 314, 317–18, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941). Neither interest accruing after insolvency, *Knox,* 111 U.S. at 785–88, 4 S.Ct. at 686–87, 28 L.Ed. at 603–04; *Fash v. First National Bank,* 89 F.2d 110, 112 (10th Cir.1937), nor any realization by a creditor of less than full payment of the debt on collateral or other security supporting the bank's obligation, *Merrill,* 173 U.S. at 146–47, 19 S.Ct. at 366–67; *American Surety Co.,* 314 U.S. at 318, 62 S.Ct. at 228, alters the extent of a creditor's participation in the insolvent bank's assets.

But the FDIC, by arguing that a claim must be "absolutely" owing on the date of deemed insolvency, seeks too narrow an interpretation of the rule. Nothing in § 194 or the opinions cited above requires us to hold that a bank's obligation to pay a fixed amount of money upon the occurrence of a specified event is rendered entirely null and void if the bank's insolvency intervenes before the triggering event occurs. It is as much the purpose of the insolvency statutes to preserve rights existing at the time of insolvency as to prevent new rights from arising thereafter. *See Merrill,* 173 U.S. at 147, 19 S.Ct. at 367 ("The requirement of equality of distribution among creditors by the national banking act involves no invasion of prior contract rights of any of such creditors, and

ought not to be construed as having, or being intended to have, such a result."); *Scott v. Armstrong,* 146 U.S. 499, 509, 13 S.Ct. 148, 151, 36 L.Ed. 1059, 1063 (1892).

The Ninth Circuit rejected the argument the FDIC presents here in *First Empire Bank-New York v. FDIC,* 572 F.2d 1361 (9th Cir.), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). It held that beneficiaries of standby letters of credit possess provable claims even when no drafts are presented prior to insolvency, if three conditions are met: first, the claims must have been in existence before insolvency and must not be dependent on new contractual obligations arising after insolvency; second, total liability must be certain at the time the beneficiaries sue the issuer's receiver; and third, the claims must be made in a timely manner, before assets are distributed from the receivership estate. *Id.* at 1367–69.

In *Philadelphia Gear Corp. v. FDIC,* 751 F.2d 1131 (10th Cir.1984), *rev'd,* —— U.S. ——, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986), we adopted the *First Empire* approach to determine whether the beneficiary of a standby letter of credit was entitled to pursue a claim for deposit insurance proceeds as a result of the issuing bank's insolvency. *Id.* at 1138; *see also Interfirst Bank Abilene v. FDIC,* 777 F.2d 1092, 1094 (5th Cir.1985) (endorsing the *First Empire* test of provability, and holding that breach of contract and fraud claims arising before insolvency could be set off against a correspondent account after insolvency). Although the Supreme Court reversed our determination that a standby letter of credit backed by a promissory note constituted a "deposit" under 12 U.S.C. § 1813, it did not address the question of probability raised by these appeals. 106 S.Ct. at 1934.[4] The right to participate

---

4. In concluding that the congressional policy of insuring "hard earnings" entrusted to a bank did not apply to a standby letter of credit backed by a contingent promissory note, the Court stated that "when Penn Square went into receivership, neither Orion nor Philadelphia Gear had lost anything except the ability to use Penn Square

to reduce Philadelphia Gear's risk that Philadelphia Gear would go unpaid for a delivery of goods to Orion." 106 S.Ct. at 1937. In the present appeals, the FDIC argues that this statement indicates that Philadelphia Gear's claim as beneficiary under the letter of credit issued by Penn Square would not have been provable

in receivership assets was not discussed in our *Philadelphia Gear* decision. But we there necessarily determined that the issuer's insolvency did not extinguish a beneficiary's claim under a standby letter of credit on which it made no demand until after the bank's insolvency; had the beneficiary of the letter of credit possessed no provable claim against the bank, it would not have had standing to seek deposit insurance.[5]

■ In this case, as in *First Empire*, the defendants' claims against the FDIC are based on irrevocable standby letters of credit issued before Penn Square's insolvency. Depending upon the letters of cred-

5. Although the Supreme Court's decision in *Philadelphia Gear* does not affect our adoption of the *First Empire* approach to the question of provability raised by these appeals, the FDIC urges us to treat the *First Empire* rule as limited to the unique facts of that case. In *First Empire*, a second bank agreed with the FDIC to purchase certain assets and assume certain liabilities of the insolvent issuing bank, thereby guaranteeing payment in full to the creditors whose claims were assumed. 572 F.2d at 1363. Among the liabilities assumed were certain letters of credit. The agreement specifically excluded assets and liabilities associated with standby letters of credit issued by the insolvent bank on behalf of a "Designated Group." The beneficiaries of these latter letters of credit sued the FDIC, claiming that the purchase and assumption agreement provided for a preference and distribution invalid under 12 U.S.C. §§ 91 and 194. *Id.* at 1369.

The FDIC argues in the present appeals that the Ninth Circuit in *First Empire* was forced to treat the unassumed letter of credit obligations as provable claims in order to avoid granting an illegal preference to the letter of credit beneficiaries whose claims were assumed. This argument is plainly incorrect. In *First Empire* the circuit made clear that the determination of provability was entirely separate from consideration of preference by purchase and assumption, and necessarily preceded consideration of the preference issue; if the plaintiffs had lacked provable claims, they would not have had standing ·to challenge the preference. *Id.* at 1366.

it as collateral, the defendants loaned money before insolvency; their claims were not dependent on any new contractual obligation arising after insolvency.[6] The other elements of the *First Empire* test were met as well. By the time these actions were filed, the defendants had presented demands for payment under all forty-three letters of credit, making total liability certain. The FDIC does not contend that the defendants failed to present their claims in a timely manner. We therefore conclude that the defendants' claims under the standby letters of credit are provable against the FDIC in its capacity as receiver.

against Penn Square's receiver. This question was not before the Supreme Court, however, and we decline to give such an expansive interpretation to the quoted language. Indeed, it is more plausible that the Supreme Court in *Philadelphia Gear* would not have addressed whether the standby letter of credit was an insured deposit, had it believed the letter represented an unprovable claim.

6. Liberty's claim as confirming bank with respect to the letter of credit issued by Penn Square to the First National Bank and Trust Company also satisfies this element of the *First Empire* test. By confirming a letter of credit, the confirming bank becomes obligated as an issuer and acquires the rights of an issuer, including the right to seek reimbursement from its customer. Okla.Stat. tit. 12A, §§ 5–107(2), 5–114(3). The confirming bank's "customer" is the bank that originally issued the letter of credit, in this case Penn Square. *Auto Servicio San Ignacio, S.R.L. v. Compania Anonima Venezolana de Navegacion*, 765 F.2d 1306, 1308 (5th Cir.1985). The obligations giving rise to Liberty's claim for reimbursement were therefore in existence prior to the declaration of Penn Square's insolvency. Allowance of this claim does not impair the rights of other creditors; Liberty's claim for reimbursement is simply substituted for First National's claim as beneficiary. In *American Surety Co. v. Bethlehem National Bank*, 314 U.S. 314, 62 S.Ct. 226, 86 L.Ed. 241 (1941), the Supreme Court held that a surety who became subrogated to a depositor's claim against an insolvent bank after the bank was declared insolvent was entitled to dividends based on the full amount of the depositor's claim. The Court said:

"To permit the surety to stand in the shoes of the secured creditor whose claim it has paid does not prejudice the rights of the general creditors. The extent of their participation in the distribution of the Bank's assets was fixed on the day it became insolvent. The surety will receive no greater share than would have been received by the Commonwealth had it not been for the circumstance that its claim was secured by a surety's bond." 314 U.S. at 318, 62 S.Ct. at 228. Similar reasoning applies to Liberty's claim as confirming bank.

### III

The FDIC next argues that, even if the defendants' claims were provable, they acted improperly in setting off their claims against Penn Square's correspondent accounts because those setoffs constituted preferences prohibited by 12 U.S.C. §§ 91 and 194.

■ It has long been established that the exercise of a right of setoff "arising by express agreement, or implied from the nature of the dealings between the parties, or by operation of law, prior to insolvency and not in contemplation thereof," is not prohibited by the statutes governing national bank insolvencies. *Scott v. Armstrong*, 146 U.S. 499, 510, 13 S.Ct. 148, 151, 36 L.Ed. 1059, 1063 (1892). Only the balance, if any, after the setoff is deducted is considered an asset of the receivership. *Id.; Hibernia National Bank v. FDIC*, 733 F.2d 1403, 1407 (10th Cir.1984). "[T]he right to setoff is governed by the state of things existing at the moment of insolvency, not by conditions thereafter arising...." *Dakin v. Bayly*, 290 U.S. 143, 148–49, 54 S.Ct. 113, 115, 78 L.Ed. 229 (1933) (citing *Yardley v. Philler*, 167 U.S. 344, 360, 17 S.Ct. 835, 840, 42 L.Ed. 192 (1897)). Therefore, if the defendants had the right to set off their claims against Penn Square's correspondent accounts on July 5, 1982, their subsequent exercise of the right of setoff was proper.

Although federal law provides the controlling principles with regard to the allowance of claims and avoidance of preferences in bank insolvency cases, *see Davis v. Elmira Savings Bank*, 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896); *FDIC v. Mademoiselle of California*, 379 F.2d 660, 662 (9th Cir.1967), setoffs are not specifically covered. Courts have looked to general equitable doctrines, *Mademoiselle*, 379 F.2d at 662–63, and state law, *Interfirst Bank Abilene v. FDIC*, 777 F.2d 1092, 1094 (5th Cir.1985), for principles underlying the right of setoff.

As the district court observed, there are both statutory and equitable bases for setoff rights under Oklahoma law. The Oklahoma "banker's lien" statute, Okla.Stat. Ann. tit. 42, § 32 (1979), provides: "A banker has a general lien, dependent on possession, upon all property in his hands belonging to a customer, for the balance due to him from such customer in the course of the business." In *Ingram v. Liberty National Bank and Trust Co.*, 533 P.2d 975 (Okla.1975), the court noted that while the statute uses the term "lien," the right created is actually one of setoff. 533 P.2d at 977. A setoff is valid under the statute if three prerequisites are satisfied: (1) the fund deposited in the bank must have been the property of the debtor; (2) the fund must have been deposited without restrictions; and (3) there must be an existing indebtedness "then due and owing by the depositor to the bank." *Id.* (quoting *Zollinger v. First National Bank*, 126 Okla. 182, 184, 259 P. 141, 143 (1926)).

■ The FDIC argues that because the defendants had not yet demanded payment under the letters of credit on the date of Penn Square's insolvency, Penn Square's indebtedness was not "then due and owing." This requirement, however, is relaxed on equitable grounds in cases of insolvency. In *Kasparek v. Liberty National Bank*, 170 Okla. 207, 39 P.2d 127 (1934), the court explained that "the theory upon which the majority rule is based appears to be that insolvency renders all debts due and furnishes of itself a sufficient ground for set-off." 170 Okla. at 209, 39 P.2d at 129 (citing *Pendleton v. Hellman Commercial Trust & Savings Bank*, 58 Cal. App. 448, 208 P. 702 (1922)).

The FDIC contends nonetheless that a right of setoff arising as a result of insolvency is invalid, citing *Davis v. Elmira Savings Bank*, 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700 (1896), and *Jennings v. United States Fidelity & Guaranty Co.*, 294 U.S. 216, 55 S.Ct. 394, 79 L.Ed.2d 869 (1935). These cases are inapposite. In *Davis* the Court held invalid a state savings bank's claim under a New York statute purporting to grant savings banks an outright preference in the distribution of an insolvent national bank's assets. 161

U.S. at 284, 16 S.Ct. at 504. Similarly in *Jennings* the Court held that an Indiana statute purporting to impose a trust on the assets of an insolvent collecting bank for the benefit of the owner of an unpaid negotiable instrument constituted a preference invalid under 12 U.S.C. § 194. 294 U.S. at 225–26, 55 S.Ct. at 398. Neither case involved the issue of setoff.

Although insolvency cannot be the occasion for a creditor to enhance his claim to receivership assets, it does not follow that the circumstance of insolvency cannot be considered in determining whether to allow a setoff of preexisting claims. In *Scott v. Armstrong*, 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059 (1892), the bank's creditor was permitted to set off its own unmatured obligation to the bank against its deposit account at the bank. The requirement that both debts be due and owing was relaxed as a result of the bank's insolvency. The Court also noted that the deposit "was due for the purposes of suit upon the closing of the Fidelity Bank, as under such circumstances no demand was necessary." 146 U.S. at 507, 13 S.Ct. at 150, 36 L.Ed. at 1062. We permitted similar setoffs in *Hibernia National Bank v. FDIC*, 733 F.2d 1403 (10th Cir.1984). *See also FDIC v. Mademoiselle of California*, 379 F.2d 660, 663 (9th Cir.1967) (insolvency may permit separate debt to be set off against joint demand).

The FDIC also contends that, even if unmatured claims can be set off in insolvency, defendants' claims are not merely unmatured but "contingent." Although the FDIC has not cited any cases on point, it appears to be the general rule that contingent claims are not a proper subject of setoff. *See City of Milwaukee v. Milwaukee Civic Developments, Inc.*, 71 Wis.2d 647, 660, 239 N.W.2d 44, 51 (1976) ("general law of recoupment and set-off does not embrace contingent claims"); *Termini v. John Arthur Exhibitions, Inc.*, 9 Misc.2d 557, 833, 169 N.Y.S.2d 584, 588 (Sup.Ct.1957) (" 'possible but unestablished liability, unliquidated in amount', may not be pleaded as an offset to a liquidated claim that is due and payable") (quoting *Dunn v. Uvalde Asphalt Paving Co.*, 175 N.Y. 214, 219, 67 N.E. 439, 440 (1903)), *aff'd*, 5 A.D.2d 973, 173 N.Y.S.2d 243 (1958), *appeal granted*, 5 N.Y.2d 711, 157 N.E.2d 511, 184 N.Y.S.2d 1025 (1959); *see generally* 80 C.J.S. *Set-Off and Counterclaim* § 28 (1953). With the exception of the single letter of credit on which defendant Liberty is confirming bank, however, defendants' claims were not contingent in the sense that the general rule contemplates, because defendants' rights to draw on the letters of credit were not in any way dependent on events occurring after insolvency.

The standby letter of credit is a kind of hybrid, having some of the characteristics of a commercial or traditional letter of credit and having some of the characteristics of an ordinary guaranty. Like a guaranty, the letter of credit is expected to be drawn upon only in the event of a default by the debtor whose line of credit or loan is collateralized by the letter of credit. But unlike the normal guaranty agreement, the issuer of the letter of credit has a duty to pay which arises upon presentment of complying documents, without regard to performance of the underlying obligation. *See* Okla.Stat.Ann. tit. 12A, § 5–114(1) (1963) ("An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary"); *Wichita Eagle and Beacon Publishing Co. v. Pacific National Bank*, 493 F.2d 1285, 1286–87 (9th Cir.1974) (distinguishing letter of credit from guaranty contract); J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 18–2 at 711–13 (2d ed. 1980); Arnold & Bransilver, *The Standby Letter of Credit—The Controversy Continues*, 10 U.C.C.L.J. 272, 279–81 (1978). Indeed, some of the letters of credit here involved specifically state that Penn Square "will have no right or obligation to inquire into the accuracy" of the statements accompanying the beneficiaries' drafts. *See,*

*e.g.,* Liberty R. I, 23–26. Thus, when a standby letter of credit is used the issuing bank stands, in a sense, in the stead of the nonbank debtor, and has a primary rather than a secondary obligation. Absent fraud, the beneficiary's statement that a default has occurred, accompanied by a demand for payment, is enough to trigger the duty of the issuing bank to pay on the letter of credit. *See Philadelphia Gear,* 751 F.2d at 1136.

Except for the letter on which Liberty was the confirming bank, Utica and Liberty allege that the loans collateralized by the standby letters of credit were in default on July 5, 1982, or became in default that day by reason of Penn Square's insolvency. These defaults were sufficient to trigger Utica's and Liberty's right to demand full payment under the letters as of the moment Penn Square was declared insolvent. The FDIC does not argue to the contrary.

We recognize that setoff in cases of insolvency effectively gives secured status to an otherwise unsecured creditor, to the extent of that creditor's indebtedness to the insolvent. Therefore we are tempted to use formal distinctions, such as the failure to make demand before the bank is deemed insolvent, to restrict the use of setoff as much as possible. But the preferential aspect of setoff has long been understood to be justified by the inequity inherent in requiring those who have dealt with insolvents to pay their debts in full while receiving only a fraction of their claims in return. *Blount v. Windley,* 95 U.S. (5 Otto) 173, 177, 24 L.Ed. 424, 426 (1877). "The equity of equality among creditors is either found inapplicable to such set-offs or yields to their superior equity." *Scott,* 146 U.S. at 511, 13 S.Ct. at 152, 36 L.Ed. at 1063.

The equities favoring setoff are especially strong when the parties have dealt with each other in reliance on the mutual credits existing between them. For example, if bank A maintains a large correspondent account at bank B, bank B may feel secure in loaning money to bank A without obtaining specific collateral for the loan, because it is protected by the doctrine of setoff in the event of bank A's default. The same strong equities apply if bank B is more willing to advance money in reliance on bank A's issuance of a standby letter of credit because bank A maintains a large correspondent account at bank B. The practical role of the setoff doctrine in facilitating credit transactions would be greatly impaired if we were to unduly restrict its availability in cases of insolvency. Moreover, in situations in which the right of setoff does not facilitate credit transactions, the parties are free to contract around this judicial rule.

Further, we have a duty to read and apply fairly the decisions of the Supreme Court. Although Penn Square was not legally bound to pay until it received the defendants' drafts, the amount of Utica's and Liberty's claims against Penn Square on those letters of credit of which they were beneficiaries was fixed at the date of insolvency and not dependent upon events occurring after insolvency. We cannot meaningfully distinguish this situation from that in *Scott v. Armstrong,* 146 U.S. at 507–12, 13 S.Ct. at 150–52, 36 L.Ed. at 1062–63, in which the Supreme Court held that a debt certain in amount but not yet due could be set off.

We think the mutual obligations existing between Penn Square and the defendants were sufficient, on the date of insolvency, to give rise to an equitable right of setoff. We therefore conclude that the defendants' subsequent exercise of that right was proper, with respect to the letters of credit of which they were beneficiaries.

■ Liberty's claim as confirming bank on the letter of credit issued to the First National Bank and Trust Company stands on a different footing. Liberty's right to seek reimbursement from Penn Square did not become fixed until July 9, 1982, when it received and paid First National's draft. On July 5, therefore, this claim was truly contingent in the sense contemplated by the general rule in that it was dependent on subsequent events not within Liberty's control and not certain to occur.

The difference in status between Liberty's claim as confirming bank and its claims as beneficiary may seem small, but we believe it is significant. In *Yardley v. Philler*, 167 U.S. 344, 17 S.Ct. 835, 42 L.Ed. 192 (1897), the Supreme Court held that a credit created on the books of a clearing house in favor of an insolvent bank as a result of charge-backs occurring after insolvency could not be set off against the insolvent bank's obligations to the clearing house. The Court held that conditions created after the moment of insolvency could . not apply. *Id.* at 360, 17 S.Ct. at 840.

The Supreme Court has also held that claims lacking mutuality on the date of insolvency may not be set off. *Dakin v. Bayly*, 290 U.S. 143, 148–50, 54 S.Ct. 113, 115–16, 78 L.Ed. 229 (1933).

Liberty cites one case, *FDIC v. American Surety Co.*, 39 F.Supp. 551 (W.D.Ky. 1941), in which the court permitted setoff against the FDIC of a claim to which the offsetting party had become subrogated after the insolvency of a national bank. The court's theory appears to have been that a right of setoff may be acquired after insolvency if it is acquired pursuant to preexisting contractual obligations. *Id.* at 557. We think this decision conflicts with the principle that the right of setoff may not be dependent on events occurring after the date of deemed insolvency.[7]

On July 5, 1982, the only party entitled to demand payment from Penn Square under the letter of credit confirmed by Liberty was the beneficiary, First National. If First National had at that time held funds belonging to Penn Square, First National rather than Liberty would have had the right of setoff. While Liberty no doubt has a provable claim against Penn Square as a result of its payment on that letter, the claims were not offsetting on the date Penn Square was deemed insolvent.

We hold therefore that Utica and Liberty were entitled to the setoffs claimed, except that the FDIC is entitled to recover $175,-000 from Liberty, representing its improperly offset claim as confirming bank, less any ratable dividend to which Liberty is entitled as an unsecured creditor of Penn Square for that amount.

IV

The FDIC has argued that the district court should not have rendered judgment against the FDIC in its corporate capacity for the deposit insurance because it was before the court only in its capacity as Penn Square's receiver. We need not consider that issue, however. Following the district court's decision in these cases, the Supreme Court held in *FDIC v. Philadelphia Gear Corp.*, —— U.S. ——, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986), that a standby letter of credit backed by a contingent promissory note is not a "deposit" as defined in 12 U.S.C. § 1813(*l*)(1). The record indicates that the letters of credit issued to Utica were backed by instruments similar to those involved in *Philadelphia Gear*. It is therefore apparent that Utica's claim for deposit insurance should have been denied.

We affirm the district court's judgment except with respect to Liberty's setoff of its claim as confirming bank and Utica's claim for deposit insurance. We reverse the district court's judgment on those two

---

7. Other cases cited by Liberty do not support a right of setoff in the circumstances presented in this appeal. *MacPherson v. Evart State Bank*, 239 Mich. 670, 214 N.W. 971 (1927), involved the issue of provability, not setoff. *Brown v. Lowe*, 182 S.C. 9, 188 S.E. 182 (1936), and *Andrew v. American Savings Bank & Trust Co.*, 217 Iowa 657, 251 N.W. 48 (1933), involved claims which were unmatured rather than contingent on the date of insolvency. In *Matter of Johnson*, 552 F.2d 1072 (4th Cir.1977), a bankruptcy case, the court allowed a bank to set off its obligation to the bankrupt on a cashier's check against its claim against the bankrupt as guarantor of certain promissory notes which had not matured at the time the bankruptcy petition was filed. This result was justified on two grounds. First, for mutual debts to be set off, § 68 of the old Bankruptcy Act, 11 U.S.C. § 108, required only that the creditor possess a provable claim against the estate, and provable claims were defined to include contingent liabilities capable of liquidation or reasonable estimation. 552 F.2d at 1077–78. Second, under Virginia law, the obligation of a guarantor on a note was no more contingent than that of a co-maker, since a guarantor was deemed to have waived any right of presentment and protest. *Id.* at 1077.

issues, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.